STATE OF NEBRASKA, APPELLEE, v. MELVIN MARTIN, APPELLANT.

206 N. W. 2d 856

Filed May 4, 1973. No. 38785.

Lester R. Seiler, for appellant.

Clarence A. H. Meyer, Attorney General, and Bernard L. Packett, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SMITH, J.

Melvin Martin was charged with the offense of receiving stolen copper of the value of more than $100 and with being a habitual criminal. A jury found him guilty of the offense, and the court sentenced him as a habitual criminal. He appeals.

Martin assigns for error (1) the denial of his motion to strike all the testimony of a prosecution witness, Ned Nelson, who admitted larceny of the copper, (2) insufficiency of the evidence to sustain the verdict, and (3) unconstitutionality of the habitual criminal statute under the federal prohibition against cruel and unusual punishment.

The testimony of Ned Nelson is as follows. In January 1972 he and Martin salvaged and sold copper taken from the Glenville dump near Hastings. The larceny occurred February 13 under these circumstances. The two men early in the morning of February 12 found 3 or 4 tons of copper with large quantities of iron pipe and cinder block. The materials were located in a gutted building at the Navy Ammunition Depot and were the property of the Hadco Company. Martin suggested stealing the copper. They then "set some copper away from the wall" and departed empty-handed because of daylight and factories nearby. About 10:45 p.m. they returned with axes, hammers, and chisels, in a 1963 Ford station wagon owned by Nelson. Until 4 a.m. frames, each of which weighed at least 600 pounds, were stripped of 1,100 pounds of copper. The men then transported the copper and unloaded it at the Glenville dump which they chose because no watchman was present.

Having arisen at 7 a.m. on February 14, Nelson and Martin in the station wagon proceeded to the dump. They loaded only part of the copper because of rough roads and returned to Hastings where Nelson parked in a parking lot. Martin then drove his Buick automobile to the dump, and the men loaded the remainder of the copper. Upon their return to the parking lot they transferred the copper in the Buick to the station wagon. The copper was covered with tarpaulin and transported to Alter's Iron Works in Council Bluffs, Iowa. Nelson and Martin helped unload the cargo. Alter's paid for the copper by issuing a check for $375.26 payable to

Nelson alone. The check was cashed at a Council Bluffs bank and the proceeds were divided evenly between Nelson and Martin. The method of payment resulted from Martin's desire to conceal his connection with the transaction.

The testimony of Nelson exhibits ill will on his part against Martin, some self-contradiction, and some contradiction of testimony by a disinterested witness. Nelson denied a bargain for immunity. Although the county judge at a preliminary hearing had bound Nelson over to District Court, the county attorney prior to the trial of Martin did not prosecute Nelson in District Court.

The testimony of Martin is as follows: Prior to February 14 he and Nelson on two occasions sold salvage to Alters. On February 14 at 7 a.m. Nelson visited the room of Martin. In the presence of Mike Broadbent, an overnight guest, Nelson asked Martin to drive him to the Glenville dump to salvage copper. The two men proceeded there in Martin's Buick, loaded the automobile, and drove to the parking lot. There they transferred the Buick load to the station wagon, and Martin helped to cover the copper with a blanket. His testimony to other events that day coincided with Nelson's version. On February 28 Martin first learned that someone had stolen copper from Hadco.

Mary Nelson, former wife of Nelson, testified that shortly after February 14 Martin had said: "A. He told me that him and Ned took copper, and took it to Council Bluffs and sold it, and when he come back, he showed me stubs on how much they got out of it, and then destroyed them. Q. Did he tell you why he destroyed them . . .? A. He wanted no connection to this where the stubs might be taken to anybody and shown. . . . He didn't want anybody to know anything about it. . . . He told me he got it from the Navy Depot. That's what he told me that they had gotten it from there."

Martin argues that the denial of his motion to strike the testimony of Nelson was erroneous under this rule: "The fact an accomplice has been guilty of willful false swearing on a material matter does not automatically discredit his testimony as a matter of law in all cases. Ordinarily, his credibility is a question for the jury under a proper cautionary instruction." State v. Oglesby, 188 Neb. 211, 195 N. W. 2d 754 (1972). We conclude that the ruling of the District Court on Martin's motion was correct.

On insufficiency of the evidence Martin argues that a participant in the larceny cannot receive the property. See, II Anderson, Wharton's Criminal Law and Procedure, § 576, p. 296 (1957); Clark & Marshall, Law of Crimes (Wingersky, 6th Rev. Ed., 1952), § 12.37, p. 856 at 858; LaFave & Scott, Handbook on Criminal Law, § 93, p. 681 at 689 (1972).

The word "receiving" in the offense of receiving stolen property, essentially means acquisition of control in the sense of physical dominion or of apparent legal power to dispose. State v. Alcorn, 187 Neb. 854, 194 N. W. 2d 798 (1972). The evidence was sufficient for a jury properly to find that Martin did not participate in the larceny but that he was guilty of the offense of receiving stolen property.

Martin asserts unconstitutionality of the habitual criminal statutes on two grounds: The prosecutor possesses a discretion whether to charge the facts referable to habitual criminality, State v. Reed, 187 Neb. 792, 194 N. W. 2d 179 (1972), and the statute provides for punishment of a status. It concededly commands an increase in the sentence of a defendant with two prior convictions, the statute embodying exceptions immaterial here. It does not prescribe a separate offense. See, § 29-2221, R. S. Supp., 1972; State v. Losieau, 184 Neb. 178, 166 N. W. 2d 406 (1969).

Habitual criminal statutes have repeatedly withstood attacks on their constitutionality under the Fourteenth

Amendment. See, Oyler v. Boles, 368 U. S. 448, 82 S. Ct. 501, 7 L. Ed. 2d 446 (1962); State v. Losieau, *supra*. New Mexico with a statute similar to the one under attack rejected the contention of cruel and unusual punishment. Its Court of Appeals said, however, that the prosecutor had no discretion. See, State v. Gonzales, 84 N. M. 275, 502 P. 2d 300 (1972); State v. Sedillo, 82 N. M. 287, 480 P. 2d 401 (1971).

Any distinction or difference between duty and discretion of the prosecutor in this context is unimportant. Discretion on the part of state representatives is inherent at many stages in administration of criminal law. To adopt Martin's argument would uproot the system, and that the Supreme Court of the United States has not countenanced. Cases striking down the death penalty, such as Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), are distinguishable. Application of the statute does not impose cruel and unusual punishment. See, State v. Losieau, 182 Neb. 367, 154 N. W. 2d 762 (1967); State v. Custer, 240 Ore. 350, 401 P. 2d 402 (1965).

The statute does not provide for punishment of a status in contravention of the Fourteenth Amendment. See State v. Gonzales, 84 N. M. 275, 502 P. 2d 300 (1972).

Other assignments of error are without merit.

AFFIRMED.