THE STATE OF OHIO, APPELLEE, *v.* WOLERY, APPELLANT.

[Cite as State v. Wolery (1976), 46 Ohio St. 2d 316.]

(No. 74-1014—Decided June 2, 1976.)

318

*Mr. George C. Smith,* prosecuting attorney, *Mr. James J. O'Grady* and *Mr. Ronald J. O'Brien,* for appellee.

*Messrs. Topper, Alloway, Goodman, DeLeone & Duffey* and *Mr. John J. Duffey,* for appellant.

PAUL W. BROWN, J.

I.

Appellant attacks the manner in which immunity from prosecution was granted to witnesses Stroebel and Johnston, asserting that such a grant was without statutory

authority, and that it did not adequately protect the constitutional rights of Stroebel and Johnston. He seeks, upon this basis, to have the testimony excluded. Appellant argues that the testimony of Stroebel, Johnston and ...mpton was the product of coercion, and therefore not credible as a matter of law. He also contends that the Franklin County prosecutor abused his discretion in his selection of those persons to be prosecuted, and, in so doing, violated appellant's right to equal protection of the laws.

At the time of appellant's trial, Ohio had no immunity statute applicable to the crimes committed by Stroebel and Johnston. R. C. 2945.44 permitted courts to grant immunity only in cases involving gambling and liquor violations. To circumvent this implicit stricture against other grants of immunity, the Franklin County prosecutor made promises of immunity to witnesses Stroebel and Johnston, and safeguarded those promises by deliberately failing to read Stroebel and Johnston the *Miranda* warnings, and by securing an entry of immunity from a judge of the Court of Common Pleas. Although this course of conduct was not sanctioned by law, it does not follow that appellant was thereby prejudiced, or that the testimony so obtained was inadmissible.

Whether the purported grant of immunity to witnesses Stroebel and Johnston will effectively shield those individuals from a future prosecution based upon their testimony in appellant's trial² is of no concern to the appellant. The Fifth Amendment privilege against self-incrimination is personal to each witness. *Hale* v. *Henkel* (1906), 201 U. S. 43.

Nor does the fact that the testimony of Stroebel and Johnston was secured in a manner not technically authorized by law prejudice the appellant. A promise of leniency offered by the state in exchange for testimony is one fac-

²See Note, Judicial Supervision of Non-Statutory Immunity, 65 J. of Criminal Law & Criminology 334 (1974); Note, Judicial Enforcement of Nonstatutory "Immunity Grants": Abrogation by Analogy, 25 Hastings Law J. 435 (1973).

tor which the jury may consider in weighing the credibility of a witness. Here, the jury was fully apprised of the means by which the testimony of Stroebel and Johnston was obtained.

In *State* v. *Johnson* (1969), 77 Wash. 2d 423, 462 P. 2d 933, similar facts were presented. The defendant, Johnson, was on trial for assault with intent to kill. An accomplice, Zaabel, was incarcerated, with two felony charges pending against him. To secure the testimony of Zaabel in the trial of Johnson, the prosecuting attorney promised Zaabel immunity, and, during the course of Johnson's trial, secured a court order dismissing both of Zaabel's pending felony counts.

The Supreme Court of Washington rejected Johnson's contention that Zaabel's testimony was inadmissible. The court stated, at pages 436-437:

"Defendant assigns error to the admission of Zaabel's testimony, contending that the promises of immunity disqualified him as a witness and rendered his testimony incompetent. He argues that, since the prosecuting attorney did not have the power to grant immunity in a case of attempted murder, his acts in doing so were without authority in law and amounted to coercion and bribery and a denial of due process of law.

"The question of the validity of a promise of immunity raised by this assignment of error is not squarely before the court, for it is the defendant and not the witness who is claiming the invalidity of that promise. The question of whether there exists an equitable right to an enforcement of this promise of immunity is not present and would arise only if at some future time the state should attempt to prosecute the witness on either of the two dismissed charges.

"One of the sordid facts of life is that the most cogent proof of guilt frequently derives from an evil source. Criminals seem to know more about crimes than good people, and the state must get its evidence where it finds it.

"A promise of immunity by the state, therefore, for the purpose of securing the testimony of one who has testimonial knowledge of the crime charged but cannot be

compelled against his will to testify is not unknown to the criminal law and does not ipso facto render the testimony incompetent and inadmissible. If the promise is unenforceable but the promisee nevertheless believes or says he believes it was made in good faith—even though both may be without legal power to bind the state to it—making of the promise alone does not render the witness incompetent or preclude his testimony. The promise of immunity goes to the weight of the testimony and may be considered by the jury in determining what effect to give to the testimony of an admitted accomplice. It is the jury and not the court which weighs the evidence and determines to what extent the promise of immunity amounts to a reward or threats and coercion in inducing the promisee witness to waive his constitutional rights against self-incrimination.

"As long as the jury is fully advised of the inducements and the tests to which an accomplice's testimony should be subjected, the actions of the state in attempting to secure the testimony of an accomplice are neither immoral nor unconscionable nor a denial of due process of law. Statutes and appellate decisions which provide for immunity in particular cases and special circumstances and sustain convictions based on the uncorroborated testimony of an accomplice have long since met both the legal and the moral test. * * *"

State v. Crepeault (1967), 126 Vt. 338, 229 A. 2d 245, and State v. Reed (1969), 127 Vt. 532, 253 A. 2d 227, are in accord. In Crepeault, the Supreme Court of Vermont stated, at pages 339-341:

"It appears in the record that the three participants who testified against the respondent were assured by the State's attorney, in open court, that they would not be prosecuted for their part in the offense. The respondent complains that the prosecutor had no authority to extend immunity to these witnesses and, in doing so, his constitutional rights were invaded. The question was presented during the course of the trial and later renewed by the motion to set aside.

"In oral argument, counsel for the state conceded that,

in the absence of a statute to this effect, as prosecuting attorney he had no specific authority to confer immunity on a witness called to testify concerning conduct which might incriminate him. If properly exercised, he did have authority to discontinue or withhold prosecution. See, *In re Tomassi*, 104 Vt. 34, 36, 156 Atl. 533; *In re Garceau*, 125 Vt. 185, 187, 212 A. 2d 633.

"In any event, the assurance affected the credibility of these witnesses rather than their competency. An accomplice who testifies against a confederate in the hope of personal advantage is competent to do so even though the prospect of reward may adversely affect his credibility. *State* v. *James*, 161 Me. 17, 206 A. 2d 410, 411; *People* v. *Jones*, 30 Ill. 2d 186, 195 N. E. 2d 698, 699; 23 C. J. S. Criminal Law Section 805; 58 Am. Jur. Witness Section 156.

"* * *

"The respondent further contends that the testimony of the young accomplices was elicited in violation of their constitutional rights against self-incrimination. The rights of the witnesses in this respect were carefully safeguarded. The fathers of the witnesses were summoned and the trial court saw to it that the boys and their parents had the benefit of the advice of competent counsel before receiving their testimony.

"The right to assert the privilege, or waive it, is personal to the witness. The respondent is in no position to assert the constitutional rights of others. These are matters beyond his control. *Hale* v. *Henkel*, 201 U. S. 43, 50 L. Ed. 652, 663, 26 S. Ct. 370; *State* v. *Geddes*, 136 A. 2d 818, 819; *State* v. *Desilets*, 96 N. H. 245, 73 A. 2d 800, 801; 8 Wigmore, Evidence, Section 2270 (McNaughton Rev. 1961)."

We hold that appellant was not prejudiced by the purported grant of immunity to witnesses Stroebel and Johnston. That grant, although not authorized by law, does not violate any right of the accused, because the privilege against self-incrimination is personal to each witness. A promise of immunity to a witness, when fully disclosed

to the jury, affects the weight to be given testimony, not its admissibility.[3]

Appellant's due process and equal protection contentions are equally without merit.

Appellant asserts, in effect, that *any* process of negotiation by which the state induces a witness to testify is coercive, and renders *any* testimony thereby obtained inadmissible. That is not so. The testimony of a witness is not rendered inadmissible merely because he expects or has been promised immunity from prosecution, a lesser penalty, or dismissal of a pending charge. *Caton* v. *United States* (C. A. 8, 1969), 407 F. 2d 367, 371; *Minkin* v. *United States* (C. A. 9, 1967), 383 F. 2d 427, 428; *Lyda* v. *United States* (C. A. 9, 1963), 321 F. 2d 788, 794-795; *United States* v. *Rainone* (C. A. 2, 1951), 192 F. 2d 860; *State* v. *Wakinekona* (1972), 53 Hawaii 574, 577, 499 P. 2d 678. See *Lisenba* v. *California* (1941), 314 U. S. 219, 227. Only when violence, torture or other form of inhumane coercion permeates the process by which testimony is obtained is that testimony inherently untrustworthy, and its admission in violation of due process. Cases cited by the appellant which illustrate this principle are distinguishable upon their facts from this cause.[4]

---

[3]Though so holding, the court wishes to indicate its disapproval of the prosecutor's decision to fail to advise witnesses Stroebel and Johnston of their constitutional rights under *Miranda* v. *Arizona* (1966), 384 U. S. 436, for the purpose of granting immunity to, and obtaining the testimony of, those witnesses. The members of the court do not condone this conduct, and prosecutors and their staffs should hereafter avoid such unseemly behavior.

[4]In *Bradford* v. *Johnson* (E. D. Mich. 1972), 354 F. Supp. 1331, affirmed (C. A. 6, 1973), 476 F. 2d 66, testimony secured by blatant torture was excluded. A witness, Payne, was questioned by police officers and prosecutors during a period in which he was "denied food, water and sleep, was physically abused and beaten about the face, sides and genitals, was threatened and degraded by racial epithets, and was threatened with the possible arrest of his wife and removal of his children from his home." Payne remained in the custody of the police officers who had tortured and abused him until the date of the trial. After testifying, he was returned to the custody of those officers.

Here, Hal Stroebel, while incarcerated in the Columbus City Prison pending trial on a felony charge, initiated discussions with police officers and the prosecuting attorney concerning a grant of immunity in exchange for testimony. To bolster Stroebel's bid for leniency, his wife, Cindy, secured one or more tape recordings implicating Donald Johnston in criminal activity.[5] At the time those record-

In vacating petitioner Bradford's conviction, the federal district court stated, at page 1338:

"No court would knowingly allow the police or prosecutor to call a person to testify who had no knowledge of the case and encourage him to conjure testimony simply because the state needed a witness. In effect, that is what happened here. Through the use of medieval torture techniques Payne was asked to be the star witness with a reward of cessation of pain and fear upon giving the proper testimony. The real threat of further abuse was not removed. Under these circumstances, the use of knowingly coerced incrimination of another is so patently untrustworthy that it rivals the knowing use of perjured testimony. The petitioner ought, at least, under a system of rebuttable presumption of innocence, to be given the safeguard of uncoerced, untortured incrimination by another."

In *LaFrance* v. *Bollinger* (D. Mass. 1973), 365 F. Supp. 198, remanded (C. A. 1, 1974), 499 F. 2d 29, also cited by appellant, an evidentiary hearing was ordered, to determine whether a statement made by an accomplice to police officers, later repudiated by the accomplice at trial, was involuntary as the product of suggestions and threats by police at a time when the accomplice was undergoing withdrawal from the use of drugs.

In *People* v. *Underwood* (1964), 61 Cal. 2d 113, 389 P. 2d 937, a similar statement was excluded because the accomplice had been interrogated while intoxicated, and had made the statement only after police officers had threatened, cursed, and frightened him.

Cf. *United States* v. *Wolfe* (C. A. 7, 1962), 307 F. 2d 798; *People* v. *Portelli* (1965), 15 N. Y. 2d 235, 205 N. E. 2d 857, certiorari denied (1966), 382 U. S. 1009. In *Portelli*, the New York Court of Appeals ruled the testimony of an accomplice admissible, although a pretrial statement consistent with that testimony, given to police officers eight months previously, was the result of overnight custody, a severe beating, and torture. Unlike in *LaFrance* and *Underwood*, no attempt was made in *Portelli* to introduce the pretrial statement in evidence.

[5]No evidence indicates that police officers participated in securing the recording or recordings which incriminated Johnston. Regardless, Johnston's testimony would be admissible. See *Procunier* v. *Atchley*

ings were made, Johnston was not incarcerated. When subsequently arrested, and confronted with the recordings, Johnston accepted an offer of immunity in exchange for testimony. Johnston testified that during the period of incarceration, he felt under "no more [pressure] than normal."

The facts surrounding the plea bargain of Lester Compton are similar. Compton was incarcerated in Columbus pending trial on a felony charge. Upon the advice of counsel (the appellant), Compton listened to police officers but refused to talk to them. At some point, according to Compton, the appellant asked him to sign a statement to the effect that police officials were attempting to "frame" appellant. Instead, Compton initiated a discussion with the prosecuting attorney concerning a plea bargain. He subsequently pleaded guilty to a lesser included offense.

No evidence in this record suggests that police officers or prosecutors coerced statements or testimony from Stroebel, Johnston, or Compton.

The pretrial statements given to prosecutors and policemen by Stroebel, Johnston, and Compton were examined by the trial court pursuant to Crim. R. 16(B)(1)(g). No inconsistencies between those statements and the testimony given at appellant's trial were discovered.

We hold that the testimony of Stroebel, Johnston, and Compton was not the product of coercion, and that its introduction in evidence did not violate appellant's right to due process of law.

Finally, appellant asserts that the decision to prosecute him, as opposed to Stroebel, Johnston, and Compton, was without a rational basis, and therefore in violation of the equal protection clause of the federal Constitution.

The discretion vested in a public prosecutor to exercise selectivity in the enforcement of criminal statutes will not

(1971), 400 U. S. 446; *Lewis* v. *United States* (1966), 385 U. S. 206; *Osborn* v. *United States* (1966), 385 U. S. 323; *Hoffa* v. *United States* (1966), 385 U. S. 293; *Lopez* v. *United States* (1963), 373 U. S. 427.

be overturned unless that selection is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler* v. *Boles* (1962), 368 U. S. 448, 456; *United States* v. *Alarik* (C. A. 8, 1971), 439 F. 2d 1349, 1350-1351; *United States* v. *Sacco* (C. A. 9, 1970), 428 F. 2d 264, 271; *Newman* v. *United States* (C. A. D. C., 1967), 382 F. 2d 479. Appellant makes no showing that his selection for prosecution was based upon race, religion, or other suspect or arbitrary classification. Therefore, his claim to a denial of equal protection is without merit.[6]

## II.

Appellant assigns as error the admission in evidence of testimony concerning his alleged commission of crimes other than those named in the indictments, and of testimony which suggested that he had "fixed" cases in Franklin County courts. Although no objection to the introduction of this evidence was made at trial, appellant argues that it should be excluded upon appeal pursuant to Crim. R. 52(B).

Prior to the adoption of Crim. R. 52(B), Ohio appellate courts would not consider "any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State* v. *Gordon* (1971), 28 Ohio St. 2d 45; *State* v. *Lancaster* (1971), 25 Ohio St. 2d 83; *State* v. *Glaros* (1960), 170 Ohio St. 471. "Any other rule," we stated in *State* v. *Driscoll* (1922), 106 Ohio St. 33, 39, "would relieve counsel from any duty or responsibility to the court and place the entire responsibility upon the trial court to give faultless instructions upon every

---

[6] The record discloses that Stroebel, Johnston, and Compton implicated numerous persons in criminal activity. A Columbus police officer testified that Stroebel and Johnston implicated 40 or 50 different individuals. The prosecuting attorney, in his brief to this court, states that based upon the testimony of Stroebel, Johnston, and Compton, the Franklin County Grand Jury returned indictments against 41 separate individuals, totaling 178 counts.

possible feature of the case, thereby disregarding entirely the true relation of court and counsel which enjoins upon counsel the duty to exercise diligence and to aid the court rather than by silence mislead the court into commission of error."

Crim. R. 52(B), effective July 1, 1973, alters this practice. It specifically provides that "[p]lain errors or defects affecting substantial rights may be noticed, although they were not brought to the attention of the court." The rule's purpose is to safeguard the right of a defendant to a fair trial, notwithstanding his failure to object in timely fashion to error at that trial. However, "[t]he plain error rule was intended to be and should be applied to serve rather than subvert the ends of justice. The rule is to be invoked only in exceptional circumstances to avoid a miscarriage of justice." *Eaton* v. *United States* (C. A. 5, 1968), 398 F. 2d 485, 486.

In this case, the testimony to which error is now assigned was admitted in evidence without objection. We conclude, from the record, that this omission was the result of a deliberate, tactical decision of trial counsel. This fact appellant concedes, at page 28 of his Memorandum in Support of Jurisdiction, filed with this court on December 23, 1974. Appellant and his counsel apparently believed that the admission of the evidence in question would so detract from the credibility of witnesses Stroebel, Johnston, and Compton as to render their entire testimony incapable of belief. Appellant cannot now claim the protection of Crim. R. 52(B) to negate the effect of this tactical decision.[7]

Two federal cases support this interpretation of Crim. R. 52(B). In *Marshall* v. *United States* (C. A. 9, 1969), 409 F. 2d 925, the Court of Appeals stated, at page 927:

"While Rule 52(b) may be invoked when the court believes that a party should not be unalterably and unfairly prejudiced by inadvertent or ignorant mistakes of his

---

[7] Appellant has not alleged, nor would the record support a finding of, incompetence of counsel.

counsel, it is not invoked where, as here, the failure to object may have been deliberate and in furtherance of legitimate trial tactics. In such a case, the concern for orderly administration of justice is paramount and should control except when the integrity of the judicial process itself would otherwise suffer. See *Ladakis* v. *United States*, 283 F. 2d 141 (10th Cir. 1960)."

In *Ladakis*, the court held, at pages 143-144:

"Counsel for Ladakis assert that the error resulting from the admission of Robinson's testimony was so serious that this court should notice it of its own motion. In criminal cases involving the life or liberty of the accused, the appellate courts of the United States may notice and correct grave errors which seriously affect substantial rights of the accused, although not challenged by objection or motion in the trial court. [Fed. Rules Crim. Proc.; Rule 52(b).] We do not regard this as such a case.

"Moreover, ordinarily a court will not notice alleged error of its own motion where, as here, the failure to object in the trial court was not due to inadvertence. Furthermore, in the instant case the action of the trial court upon which the claim of error is predicated was acquiesced in and silently approved by counsel for the complaining party."

We hold that Crim. R. 52(B) may not be invoked to exclude allegedly prejudicial testimony to the admission of which no objection was made at trial as a deliberate tactic of counsel.

### III.

Appellant assigns as error a response by the trial judge to a question propounded by the jury during the course of its deliberations. He further asserts that his conviction upon each of four counts was not supported by the weight of the evidence.

### A.

At the close of the first day of its deliberations, the jury submitted two questions in writing to the trial judge. One question stated:

"Does receiving and concealing extend to the point of materially benefiting from the act without physical possession of the merchandise?"

The judge, in writing, responded:

"Not necessarily. To prove the receipt of stolen property it is not necessary to show that it came into the actual or manual possession of the defendant. It is sufficient in that regard to show it came into the custody or control of the defendant so that he could direct the disposal of it. The mere fact, however, that the property was in the possession of the defendant, if such should be the fact, would not alone constitute the receiving of the property. Receiving implies some act on the part of the defendant by which the property came into his possession with his knowledge, consent, and approval."

This response is a correct statement of law. The "prevailing rule at common law and in most jurisdictions is that actual physical possession is not a requisite of receiving. Possession may be constructive." *State v. Bozeyowski* (1962), 77 N. J. Sup. 49, 57, 185 A. 2d 393, certiorari denied (1963), 374 U. S. 851; *Gordon v. State* (1927), 6 Ohio Law Abs. 87; *United States v. Parent* (C. A. 7, 1973), 484 F. 2d 726; *State v. Martin* (1973), 190 Neb. 212, 206 N. W. 2d 856; *Eliason v. State* (Alaska, 1973), 511 P. 2d 1066; *State v. Hart* (1972), 14 N. C. App. 120, 187 S. E. 2d 351; *United States v. Cousins* (C. A. 9, 1970), 427 F. 2d 382; *State v. Ashby* (1969), 77 Wash. 2d 33, 459 P. 2d 403; *Weddle v. State* (1962), 228 Md. 98, 178 A. 2d 882. Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession.

Appellant places great stress upon the first two words employed by the trial court in its response to the jury's question. Those words were neither confusing nor prejudicial. The words "[n]ot necessarily" indicated that while a material benefit alone was insufficient to constitute receipt, physical possession of the property itself was not required. The court's response to the question was proper.

## B.

This court is not required to review the weight of evidence in a criminal case. "This court may, however, examine the record with a view of determining whether the proper rules as to the weight of the evidence and degree of proof have been applied." *State* v. *Martin* (1955), 164 Ohio St. 54, 57.[8] In the syllabus to *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, we stated:

---

[8]Absent a statute which provides otherwise, a criminal conviction in this state may be based solely upon the uncorroborated testimony of an accomplice. *State* v. *Flonnory* (1972), 31 Ohio St. 2d 124; *Beckman* v. *State.* (1930), 122 Ohio St. 443; *State* v. *Lehr* (1918), 97 Ohio St. 280; *Allen* v. *State* (1859), 10 Ohio St. 287. At the time of appellant's trial, statutory proscriptions were contained only in R. C. 2945.60 (treason), R. C. 2945.61 (misprision of treason), R. C. 2945.62 (perjury), and R. C. 2945.63 (seduction of a female). None are relevant to disposition of this cause.

The Ohio rule regarding corroboration of accomplice testimony is in accord with the federal rule, *Caminetti* v. *United States* (1917), 242 U. S. 470, 495; *United States* v. *Miceli* (C. A. 1, 1971), 446 F. 2d 256, 258-259; *United States* v. *Corallo* (C. A. 2, 1969), 413 F. 2d 1306, 1323; *United States* v. *De Larosa* (C. A. 3, 1971), 450 F. 2d 1057, 1060-1061; *United States* v. *Miller* (C. A. 4, 1971), 451 F. 2d 1306, 1307; *United States* v. *Beasley* (C. A. 5, 1975), 519 F. 2d 233, 242; *United States* v. *Willis* (C. A. 6, 1973), 473 F. 2d 450, 454; *United States* v. *Adams* (C. A. 7, 1972), 454 F. 2d 1357, 1360; *United States* v. *Dunn* (C. A. 8, 1974), 494 F. 2d 1280, 1281-1282; *United States* v. *Sacco* (C. A. 9, 1974), 491 F. 2d 995, 1003-1004; *United States* v. *Downen* (C. A. 10, 1974), 496 F. 2d 314, 318; *United States* v. *Lee* (C. A. D. C., 1974), 506 F. 2d 111, 118, and with the rule in 47 of 49 states.

Twenty-nine states do not require corroboration of accomplice testimony. *People* v. *Martinez* (Colo. 1975), 531 P. 2d 964, 965; *State* v. *LaFountain* (1954), 140 Conn. 613, 616, 620-621, 103 A. 2d 138; *O'Neal* v. *State* (Del., 1968), 247 A. 2d 207, 210; *Anderson* v. *State* (Florida, 1970), 241 So. 2d 390, 396; *Scott* v. *State* (1972), 229 Ga. 541, 545, 192 S. E. 2d 367; Cf. *Famber* v. *State* (1975), 134 Ga. App. 112, 213 S. E. 2d 525 (Ga. Code Ann. 38-121); *State* v. *Carvelo* (1961), 45 Hawaii 16, 42, 361 P. 2d 45; *People* v. *Mentola* (1971), 47 Ill. 2d 579, 583, 268 N. E. 2d 8; *Newman* v. *State* (Ind. 1975), 334 N. E. 2d 684, 687; *State* v. *Bey* (1975), 217 Kan. 251, 260, 535 P. 2d 881; *State* v. *Matassa* (1952), 222 La. 363, 379, 62 So. 2d 609; *State* v. *Smith* (Me. 1973), 312 A. 2d 187, 188; *Commonwealth* v. *French* (1970), 357 Mass. 356, 396, 259 N. E. 2d 195; *People* v. *DeLano* (1947), 318 Mich.

"1. On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact.

"2. A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court."

557, 567-568, 28 N. W. 2d 909; *Sanders* v. *State* (Miss. 1975). 313 So. 2d 398, 400; *State* v. *Lang* (Mo., 1974), 515 S. W. 2d 507, 509; *State* v. *Oglesby* (1972), 188 Neb. 211, 212, 195 N. W. 2d 754; *State* v. *Rumney* (1969), 109 N. H. 544, 545, 258 A. 2d 349; *State* v. *Begyn* (1961), 34 N. J. 35, 54, 167 A. 2d 161; *State* v. *Macs* (1970), 81 N. M. 550, 554, 469 P. 2d 529; *State* v. *McNair* (1967), 272 N. C. 130, 132, 157 S. E. 2d 660; *Commonwealth* v. *Bradley* (1972), 449 Pa. 19, 21-22, 295 A. 2d 842; *State* v. *Pella* (1966), 101 R. I. 62, 69, 220 A. 2d 226; *State* v. *Steadman* (1972), 257 S. C. 528, 537-538, 186 S. E. 2d 712; *State* v. *Crepeault* (1967), 126 Vt. 338, 341-342, 229 A. 2d 245; *Brown* v. *Commonwealth* (1968), 208 Va. 512, 515, 158 S. E. 2d 663; *State* v. *Johnson* (1969), 77 Wash. 2d 423, 439, 462 P. 2d 933; *State* v. *Humphreys* (1945), 128 W. Va. 370, 375-376, 36 S. E. 2d 469; *Kutchera* v. *State* (1975), 69 Wis. 2d 534, 230 N. W. 2d 750, 758; *Loddy* v. *State* (Wyoming, 1972), 502 P. 2d 194, 196.

In 17 states, corroboration is required by statute. Ala. Code, Title 15, Section 307; Alaska Stats., Title 12, Section 45.020; Arizona Rev. Stats., Section 13-136; Ark. Stats., Section 43-2116; Idaho Code, Section 19-2117; Iowa Code Anno., Section 782.5; Minn. Stats. Anno., Section 634.04; Mont. Rev. Code Anno., Section 94-7220; McKinney's Consol. Laws of N. Y., Anno., Crim. Proc. Law, Section 60.22; N. D. Cent. Code Anno., Title 29, Section 21-14; Okla. Stats. Anno., Title 22, Section 742; Ore. Rev. Stats., Section 136.440; S. D. Comp. Laws Anno., Title 23, Section 44-10; Vernon's Tex. Stats. Anno., Code Crim. Proc., Art. 38.14; Utah Code Anno. 1953, Title 77, Section 31-18. Cf. West's Anno. Calif. Code, Penal, Section 1111 and Nev. Rev. Stats., Section 175.291, which define an accomplice as "one who is liable to prosecution *for the identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Emphasis added.)

In Kentucky, corroboration is required by Crim. R. 9.62, which incorporated the substance of Crim. Code Sections 241 and 242.

In Maryland and Tennessee, corroboration is required by judicial decision. See *Watson* v. *State* (1955), 208 Md. 210, 217, 117 A. 2d 549; *State* v. *Fowler* (1963), 213 Tenn. 239, 245-246, 373 S. W. 2d 460.

See *Scaccuto* v. *State* (1928), 118 Ohio St. 397; *Breese* v. *State* (1861), 12 Ohio St. 146.

Here, appellant's convictions upon two counts of receiving stolen antique glassware, and upon one count of receiving a stolen clock, lamp, table, and music box, are fully supported by the evidence. Probative evidence was directed to each element of those crimes. That evidence, if believed by the jury, was sufficient to establish appellant's guilt beyond a reasonable doubt.

The same is true of appellant's conviction for receiving two Mark 12(A) airplane radios. The record discloses that appellant served as attorney and advisor to one Michael Casurta, who operated a flying school. Stroebel testified that appellant offered to buy airplane radios if Stroebel and Johnston would steal them. Stroebel, Johnston, Casurta, and appellant met at Port Columbus airport, where Casurta showed Johnston how to disconnect and remove radios from airplanes.

Stroebel, Johnston, and Stroebel's wife, Cindy, drove to the Zanesville airport, where they stole the radios. Johnston delivered the radios to Casurta at the flying school, and was paid by Casurta for his services. Stroebel testified that he received nothing for his part in the robbery because he owed appellant attorney fees.

This testimony, if believed by the jury, was sufficient to sustain appellant's conviction. Possession of stolen property may be individual or joint, actual or constructive. Proof of control or dominion is essential. But control or dominion may be achieved through the instrumentality of another.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, CELEBREZZE, and W. BROWN, JJ., concur.