[Cite as *State v. Haas*, 2014-Ohio-5770.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | : | **CASE NO. 2014-A-0025** |
| - vs - | : | |
| CHARLES B. HAAS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2013 CR 623.

Judgment: Affirmed.

*Nicholas A. Iarocci,* Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047-1092 (For Plaintiff-Appellee).

*Anna Markovich,* 18975 Villaview Road, Suite 3, Cleveland, OH 44119 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1}  Appellant, Charles B. Haas, appeals his conviction, following a jury trial, in the Ashtabula County Court of Common Pleas of illegal manufacturing of methamphetamine and illegal assembly or possession of chemicals for the manufacture of methamphetamine.  At issue is whether appellant's conviction was supported by sufficient, credible evidence.  For the reasons that follow, we affirm.

{¶2} Appellant was charged in a ten-count indictment with offenses related to the illegal manufacture of methamphetamine ("meth") and the illegal assembly or possession of chemicals for the manufacture of meth. After the trial court dismissed certain counts and merged others, appellant was convicted of the following three offenses: one count of illegal manufacture of meth, a felony of the first degree, and two counts of illegal assembly or possession of chemicals for the manufacture of meth, each being a felony of the third degree.

{¶3} The statement of facts that follows is derived from the evidence presented during the jury trial. Lieutenant Timothy Brown of the Madison Township Police Department testified he is assigned to investigate and prosecute meth violations in the township. Since 2011, he has been involved in the prosecution of some 250 people for meth violations. He said that all Ohio pharmacies are required by law to report all sales and attempted sales of pseudoephedrine to a central pseudoephedrine clearing house, called NPLEX. Pseudoephedrine, a decongestant, is the active ingredient of meth. The purpose of the NPLEX system is to monitor suspicious purchases of pseudoephedrine tablets. A customer cannot purchase more pseudoephedrine than the amount prescribed by law in any consecutive 30-day period. Purchases of pseudoephedrine must be made at a pharmacy. All purchase requests are submitted by the pharmacy to NPLEX along with the customer's driver's license. The transaction is either approved by NPLEX or, if the amount requested exceeds the limit prescribed by law, the transaction is denied. All such transactions are recorded and the information is available to law enforcement. While purchases may be technically within the prescribed limits, the number, frequency, timing, and other pertinent circumstances surrounding

2

purchases of pseudoephedrine are considered by law enforcement in determining whether purchases are suspicious.

{¶4} Lt. Brown testified that, due to the limit on the amount of pseudoephedrine a customer can purchase, manufacturers of meth often enlist friends, relatives, and other drug users to purchase pseudoephedrine for them to be used to manufacture meth. These buyers typically purchase the pseudoephedrine for the manufacturer in exchange for cash, meth, or both.

{¶5} Lt. Brown said that on August 11, 2013, he learned that appellant had attempted to purchase pseudoephedrine at Wal Mart in Madison, but that this attempted purchase was denied because the purchase would have exceeded his limit for that 30-day period. Lt. Brown entered appellant's name in NPLEX, and saw that appellant recently made a large number of suspicious purchases of pseudoephedrine.

{¶6} During the month of July 2013, appellant bought or was denied pseudoephedrine eight times at various pharmacies in Ashtabula. On one date, he attempted to buy pseudoephedrine, but the sale was denied. One-half hour later, he tried to buy pseudoephedrine at another pharmacy, but this sale was also denied. On another date, appellant was denied pseudoephedrine at one pharmacy, and, ten minutes later, he tried to buy it at another pharmacy, but that sale was also denied. Lt. Brown said that an attempt to buy pseudoephedrine at one store after being recently denied the drug by another store makes the second purchase suspicious.

{¶7} During August 2013, appellant bought or was denied pseudoephedrine 13 times. These transactions often took place on successive or even the same days, again, making these purchases suspicious. On one date, appellant tried to buy, but was

denied, pseudoephedrine four times at two different pharmacies, all within a 15-minute period.

{¶8} During the month of September 2013, appellant bought or was denied pseudoephedrine four times. On one date, he was denied pseudoephedrine at one pharmacy, and one-half hour later, he went to another pharmacy and bought the drug.

{¶9} Lt. Brown said that in this period, he learned that a female known to him as Samantha McCall was making suspicious purchases of pseudoephedrine at the same stores in Ashtabula on or near the same dates appellant was buying. This led the officer to believe she was buying pseudoephedrine with appellant.

{¶10} Lt. Brown reviewed McCall's NPLEX history. She bought or was denied pseudoephedrine five times in July 2013. On one date, she tried to buy pseudoephedrine at one pharmacy, but was denied. One-half hour later, she tried to buy it at another pharmacy and was again denied the drug.

{¶11} McCall also bought or was denied pseudoephedrine five times in August 2013. On one date, she bought pseudoephedrine twice, once at one pharmacy and, just 20 minutes later, at another nearby pharmacy. Lt. Brown said that people using pseudoephedrine for legitimate purposes do not generally drive down the road to make a separate purchase of more of the same drug.

{¶12} McCall's NPLEX history shows that she and appellant bought or attempted to buy pseudoephedrine at the same store within minutes of each other on two days in August 2013, indicating that each time they were in the store together.

{¶13} Lt. Brown testified he knew that McCall is involved in a relationship with one Jeremy Pierce. He thus reviewed Pierce's NPLEX report and found he also made

4

repeated purchases of pseudoephedrine from the same stores in Ashtabula. Pierce bought pseudoephedrine four times at four different pharmacies in July 2013. In addition, he bought or was denied the drug three times in August 2013.

{¶14} Lt. Brown testified he knew that appellant is involved in a relationship with one Maria Wooten and they have three children together. Lt. Brown also checked her NPLEX history and learned that she made suspicious purchases of pseudoephedrine on several occasions in this same time period at the same pharmacies in Ashtabula.

{¶15} Wooten bought or was denied pseudoephedrine eight times in July 2013. On one date, shortly after she was denied pseudoephedrine at one pharmacy, she attempted to buy, but was denied, the drug at another pharmacy. On another date, one-half hour after being denied pseudoephedrine at one pharmacy, she was allowed to buy the drug at another pharmacy.

{¶16} In August 2013, Wooten bought or was denied pseudoephedrine four times. On August 16, the same day appellant unsuccessfully tried to buy pseudoephedrine four times, Wooten bought the drug.

{¶17} Wooten's NPLEX records show that she and appellant bought or attempted to buy pseudoephedrine at the same store within minutes of each other four times in July 2013 and four times in August 2013, indicating that each time they were in the store together.

{¶18} Lt. Brown said that when he started to investigate appellant's purchases of pseudoephedrine, he did not know where he was living. As a result, he went on the Attorney General's website. In researching appellant, Lt. Brown saw that Deputy Matthew Johns from the Ashtabula County Sheriff's Office had recently tried to

determine appellant's address in connection with a theft appellant committed at K Mart, which that agency was investigating.

**{¶19}** Lt. Brown said the theft complaint showed that on August 2, 2013, just one-half hour before appellant bought pseudoephedrine at another pharmacy, he went to K Mart, bought a bottle of Coleman fuel and stole a package of lithium batteries. Video taken of appellant fleeing K Mart showed he was driving his girlfriend Wooten's car.

**{¶20}** Lt. Brown said that the K Mart theft is significant because it shows that within one-half hour, appellant went to two different stores to buy ingredients that are essential in manufacturing meth.

**{¶21}** Jeremy Pierce testified he knows appellant and they are friends. Pierce said he was subpoenaed and was not testifying voluntarily. He said that appellant's girlfriend is Wooten and that appellant lives with her and their three children in an apartment on West 19th Street in Ashtabula. Pierce said he visited appellant several times at his apartment in July and August 2013.

**{¶22}** Pierce said that appellant asked him to buy pseudoephedrine for him several times and that he bought it for him in exchange for meth, which appellant had on him, or money. He said that appellant would take him to the pharmacies. Pierce would pay for the pseudoephedrine with money appellant gave him for this purpose.

**{¶23}** Pierce said he bought pseudoephedrine for appellant several times in July and August 2013. He said that on a few occasions, he was in the same car with his girlfriend, Samantha McCall, when appellant drove her to pharmacies to buy pseudoephedrine for him in exchange for meth or cash.

**{¶24}** NPLEX records show that Pierce and McCall bought pseudoephedrine by signing their own names for the drug, although, according to Pierce, these purchases were for appellant, making them illegal.

**{¶25}** Pierce identified appellant on security video showing him holding Coleman fuel while walking in K Mart on August 2, 2013, the date he stole lithium batteries from that store, and on other security video showing appellant buying pseudoephedrine at a pharmacy during one of the incidents referenced above.

**{¶26}** Ashley Pazone, a security employee at K Mart in Ashtabula testified that on August 2, 2013, she saw appellant purchase a bottle of Coleman fuel. She also saw him take a package of lithium batteries, tear it open, and conceal the batteries in his pants pocket. She identified the store's exterior video showing the license plate of the car in which appellant escaped. She contacted the Ashtabula County Sheriff's Office to report the theft and appellant was charged with this offense.

**{¶27}** Detective George Cleveland of the Ashtabula County Sheriff's Office, certified in Ohio to investigate and remediate meth labs, testified that the chemicals required to manufacture meth are ammonium nitrate crystals from instant cold packs, pseudoephedrine tablets, Coleman fuel, lithium strips from lithium batteries, lye or acid drain cleaner, and water. He said the lithium strips, Coleman fuel, and water create a volatile chemical reaction, which changes pseudoephedrine into meth. A second plastic bottle is used as a "gas generator," which "gasses off" the Coleman fuel from the liquid meth and turns it into a powder that can be ingested.

**{¶28}** Detective Cleveland testified that on September 26, 2013, he and his team went to 1627 West 19th Street on a complaint of individuals cooking meth where

7

children resided. The apartment complex is a two-story public housing project with three attached apartments that share common walls. Each apartment has three units and the complex has a total of nine units. Upon arrival, they went to Apartment A, appellant's apartment.

{¶29} Detective Cleveland knocked on the door. The interior door was open and the screen door was closed with the screen open. The occupant, Wooten, answered with her and appellant's five-year-old son in tow. As the detective was knocking on the door, he detected coming from inside the apartment a "very strong" chemical odor, which he immediately knew to be that of a meth lab. He said that meth labs have a distinctive smell from the combination of solvents, fuel and acid. He said, "these odors all combine into a very specific meth lab odor." He said he has never "smelled anything in [his] entire life that smells like a meth lab."

{¶30} Detective Cleveland told Wooten why they were there. He said he smelled a meth lab in her apartment, and explained the dangers associated with meth labs, especially for children. He told her he would need to search her apartment for the meth lab. She pulled her child inside, closed the interior door, and yelled they would need a search warrant. Not wanting her or her son to run back in the meth lab, the detective forced the door open, grabbed her and her child, and brought them outside to remove them from the danger presented by the meth lab.

{¶31} Detective Cleveland told Wooten she and her son could not enter the hazardous environment again until they determined what stage of the chemically reactive process the meth lab was in and that the interior was too toxic for her to go in.

8

{¶32} When Detective Cleveland walked into the kitchen, he was immediately able to locate the source of the odor as a one-pot meth lab he found in a cupboard. The pot contained the chemicals associated with a one-pot meth lab. The bottle had finished the active cooking stage and started to degrade from the corrosive chemicals inside. Detective Cleveland also found a half-empty blister pack of pseudoephedrine tablets in the cupboard next to the one-pot meth lab. Wooten was then arrested.

{¶33} Detective Cleveland also found a bottle of acid drain opener, used to manufacture meth, in the upstairs bathroom. The detective also found a second two-liter bottle made into a gas generator in a wooded area just off the parking lot near appellant's apartment.

{¶34} As Wooten was being arrested, appellant showed up. He told Detective Cleveland that somebody must have broken into their apartment last night (i.e., September 25, 2013) through the attic and hid the meth lab in the kitchen cupboard. When Detective Cleveland told him that was impossible, appellant became somber and said, "Okay, they're mine," referring to the one-pot meth lab and the bottle of drain opener found in the upstairs bathroom, both of which had been put outside the apartment. Appellant said he found these items in the parking lot and that he picked them up and brought them into his home so they would not explode. Thus, appellant admitted the meth lab was brought into his apartment on September 25, 2013 and that it belonged to him. Appellant was then arrested.

{¶35} Detective Cleveland said that, although the one-pot meth lab was no longer cooking, it was still dangerous and volatile because the caustic and combustible chemicals were still in it and the resulting flammable solvent vapors remained airborne.

9

He said the lithium can spontaneously ignite, causing an explosion when it comes into contact with moisture in the air. He said that when they remediated appellant's one-pot meth lab, there was a strong exothermic (heat) reaction that actually melted portions of the five-gallon, heavy-duty bucket they use to remediate one pot labs.

{¶36} Susan Massaro, manager of the Ashtabula Metropolitan Housing Authority, testified Wooten's lease was terminated on October 1, 2013, due to meth activity in the apartment. She said the apartment was secured until it was tested.

{¶37} Roy Wilkinson, lab technician with Safety Elements, a meth-testing laboratory, testified that samples were taken from appellant's apartment. Mr. Wilkinson said these samples were tested, and the upstairs bathroom and all three bedrooms tested positive for the presence of meth.

{¶38} The defense presented no witnesses to testify on appellant's behalf. Thus, the state's evidence was undisputed.

{¶39} Following the jury trial, appellant was convicted of one count of illegal manufacture of meth and two counts of illegal assembly or possession of chemicals for the manufacture of meth. One count of illegal possession of chemicals involved the Coleman fuel and lithium batteries appellant obtained from K Mart on August 2, 2013. The second count of illegal possession of chemicals involved the pseudoephedrine appellant bought between July 1, 2013 and July 31, 2013.

{¶40} At sentencing, the court noted that appellant was previously convicted of theft (2003); domestic violence (2008); assault on a police officer (2008); menacing (2009); theft (2010); aggravated theft and attempted felonious assault, for which he was

sentenced to prison (2010); misuse of credit cards (2013); and theft and resisting arrest (2013).

{¶41} In the instant case, the trial court sentenced appellant to six years for illegal manufacture of meth. Further, the court sentenced appellant to two years in prison on each count of illegal assembly or possession of chemicals for the manufacture of meth. The court made the necessary findings for consecutive sentences under R.C. 2929.14, and ordered all sentences to run consecutively, for a total of ten years in prison. Appellant appeals, asserting two assignments of error. Because they are related, they are considered together. They allege:

{¶42} "[1.] There was insufficient evidence for a reasonable finder of facts to determine that appellant illegally manufactured drugs, illegally assembled or possessed chemicals for manufacture of drugs, and endangered children.

{¶43} "[2.] The trial court's verdict that appellant was guilty of illegal manufacture of drugs and illegal assembly or possession of chemicals for the manufacture of drugs is against the manifest weight of the evidence in violation of Article IV, Section 3, of the Ohio Constitution."

{¶44} An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390

11

(1997) (Cook, J., concurring). Whether the evidence is legally sufficient to sustain a verdict is a question of law which we review de novo. *Id.* at 386.

{¶45} In contrast, a court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *Thompkins*, *supra*, at 387. The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* The discretionary power to grant a new trial should only be exercised in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Witness credibility rests solely with the finder of fact, and an appellate court is not permitted to substitute its judgment for that of the jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "The jury is entitled to believe all, part, or none of the testimony of any witness." *State v. Archibald*, 11th Dist. Lake Nos. 2006-L-047 and 2006-L-207, 2007-Ohio-4966, ¶61. The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. *Thompkins*, *supra*, at 390. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict. *State v. Banks*, 11th Dist. Ashtabula No. 2003-A-0118, 2005-Ohio-5286, ¶33.

{¶46} The evidence presented by the state against appellant was largely circumstantial in nature. Circumstantial evidence is the proof of facts by direct evidence from which a factfinder may reasonably infer the existence of other facts. *State v. Pistillo*, 11th Dist. Lake No. 2003-L-183, 2004-Ohio-6333, ¶20. Circumstantial evidence

12

and direct evidence inherently possess the same probative value. *Jenks*, *supra*, at 272. As circumstantial evidence and direct evidence are indistinguishable in this respect, "all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Id.*

{¶47} Appellant was convicted of illegal manufacture of meth, in violation of R.C. 2925.04, and two counts of illegal assembly or possession of chemicals for the manufacture of meth, in violation of R.C. 2925.041. R.C. 2925.04(A)(C)(4) provides, "[n]o person shall knowingly * * * manufacture or otherwise engage in any part of the production of [meth] * * * in the vicinity of a juvenile * * *."

{¶48} **The Sufficiency of the Evidence Regarding the Illegal Manufacturing of Meth**

{¶49} With respect to the manufacturing charge, appellant does not dispute that there was a meth lab in his apartment. Instead, he argues the state did not present sufficient evidence that he manufactured meth at his apartment between September 25, 2013 and September 26, 2013, as alleged in the indictment. We do not agree.

{¶50} First, appellant purchased or was denied pseudoephedrine at various pharmacies on 25 separate occasions between July 13, 2013 and September 22, 2013. Further, these transactions were made under suspicious circumstances. For example, he bought or attempted to buy the drug on the same or successive days. Also, he attempted to buy the drug on the same day after being denied the drug at another pharmacy. Appellant also enlisted at least three others who illegally purchased pseudoephedrine for him. In exchange for their services, appellant paid them in meth, which he carried on him, or cash. Further, appellant purchased Coleman fuel and

13

pseudoephedrine and stole lithium batteries on August 2, 2013, each of which is required to manufacture meth.

{¶51} In addition, on September 26, 2013, Detective Cleveland went to appellant's apartment. While knocking at the door, he detected a distinctive odor, which, he said, he "knew to be that of a meth lab." He found a meth lab in a kitchen cupboard. He also found a half-used packet of pseudoephedrine tablets beside it and a bottle of acid drain cleaner in the upstairs bathroom. These are chemicals used to manufacture meth. Further, although the meth lab was finished cooking, the completion was recent enough that the lab still produced a "very strong odor." Detective Cleveland said the one-pot lab they found contained the chemicals necessary for the manufacture of meth.

{¶52} Moreover, Detective Cleveland said the lab was still dangerous and combustible and had only started to degrade from the corrosive chemicals inside. He said that flammable solvent vapors from the meth lab were still escaping so that the lab was still subject to explosion. In fact, he said that during their remediation of the lab, it had an exothermic reaction, as a result of which the heat generated by the one-pot lab was so intense, it melted portions of the five-gallon, heavy-duty bucket in which they remediated the meth lab. Further, although at first appellant denied any connection with the one-pot lab, he changed his story and admitted that the meth lab belonged to him and that he knew it was still combustible. Appellant's admitted ownership of the meth lab while it was still giving off a very strong odor associated with meth labs provided circumstantial evidence that it had recently been used.

14

{¶53} Moreover, contrary to appellant's argument, the state presented evidence that appellant lived with Wooten at her West 19th Street apartment at all relevant times and that he was at the apartment on September 26, 2013. First, Jeremy Pierce, appellant's friend, said that appellant lived there with his girlfriend and their three children. Pierce knew appellant lived there because he visited appellant several times at the apartment, each time at appellant's invitation and each time he stayed a few hours. In addition, appellant admitted to Detective Cleveland that he lived at this apartment.

{¶54} In summary, appellant had been buying pseudoephedrine continually and in suspicious circumstances from July 2013 until September 26, 2013, when he was found with a meth lab. He also enlisted associates to buy pseudoephedrine for him. He also bought and stole other essential ingredients of meth in this period. Detective Cleveland smelled a very strong odor of a meth lab on entering appellant's apartment, indicating the one-pot meth lab had recently been used. Inside, the officers found a meth lab, pseudoephedrine tablets, and acid drain cleaner, items needed to manufacture meth. Further, although appellant initially denied any connection to the meth lab, he eventually admitted that he brought it into the house on September 25, 2013, and that it belonged to him.

{¶55} In *State v. Campbell*, 11th Dist. Ashtabula No. 2013-A-0047, 2014-Ohio-972, ¶10, although the meth lab at issue was no longer cooking, this court held that appellant's conviction of illegal manufacture of meth was supported by sufficient evidence where, upon opening the door of appellant's residence, the officer smelled a

15

strong odor of a meth lab inside the residence and found a meth lab and other items used in the manufacture of meth. *Id.* at ¶45-48.

{¶56}  Next, the state presented sufficient evidence to support his conviction of two counts of illegal assembly or possession of chemicals for the manufacture of meth. R.C. 2925.041(A) provides, "[n]o person shall knowingly assemble or possess one or more chemicals that may be used to manufacture [meth] * * * with the intent to manufacture [meth] * * *." R.C. 2925.041(B) provides, "[i]n a prosecution under this section, it is not necessary to allege or prove that the offender assembled or possessed all chemicals necessary to manufacture  [meth] * * *. The assembly or possession of a single chemical that may be used in the manufacture of [meth] * * *, with the intent to manufacture [meth] * * *, is sufficient to violate this section."

{¶57}  Further, "[a] person acts knowingly * * * when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶58}  Moreover, "[p]urpose and intent mean the same thing."  4 OJI 409.01.  "To do an act purposely is to do it intentionally and not accidentally."  *Id.*  "Purpose is a decision of the mind to do an act with a conscious objective of * * * engaging in specific conduct."  *Id.*  A person's intent is known only to himself unless he expresses it to others or indicates it by his conduct."  *Id.*  Thus, the state must often resort to circumstantial evidence to prove a defendant's mental state, such as knowledge or intent, because a defendant hardly ever articulates his mental state.  *State v. Griffin*, 1st Dist. Hamilton Nos. C-77838, C-780002, 1979 Ohio App. LEXIS 8613, *3 (Jan. 3, 1979).

{¶59} "Possession of drugs can be either actual or constructive." *State v. Rollins*, 3d Dist. Paulding No. 11-05-08, 2006-Ohio-1879, ¶22, citing *State v. Haynes*, 25 Ohio St.2d 264 (1971). Even if the contraband is not in a suspect's "immediate physical possession," the suspect may still constructively possess the item, so long as the evidence demonstrates that he or she "was able to exercise dominion and control over the controlled substance." *State v. Lee*, 11th Dist. Trumbull No. 2002-T-0168, 2004-Ohio-6954, ¶41, citing *State v. Wolery*, 46 Ohio St.2d 316, 329 (1976). To prove constructive possession, it must also be shown that the person was aware of the presence of the object. *State v. Hankerson*, 70 Ohio St.2d 87, 91 (1982).

{¶60} **The Sufficiency of the Evidence Regarding the Illegal Assembly or Possession of Chemicals For the Manufacture of Meth**

{¶61} Appellant was convicted of two counts of illegal assembly or possession of chemicals for the manufacture of meth. With respect to the charge of illegal possession of Coleman fuel and lithium batteries on August 2, 2013, Ashley Panzone, K Mart security, testified that appellant purchased Coleman fuel and stole lithium batteries by tearing open the package and concealing the batteries in his pants pocket. He thus knew he was in possession of these chemicals. Appellant concedes this was Ms. Panzone's testimony, but argues the quality of the store video made it impossible to identify the person depicted or the fuel in his hands. However, this is a credibility issue, which is not relevant to appellant's sufficiency argument. Panzone's identification of appellant and the fuel, if believed, was sufficient to prove that he possessed this item. *Thompkins*, *supra*.

17

{¶62} With respect to the charge of illegal assembly or possession of pseudoephedrine between July 1, 2013 and July 30, 2013, to manufacture meth, appellant purchased pseudoephedrine three times and was denied the drug on five other occasions in this period. He therefore knowingly possessed pseudoephedrine in this time frame.

{¶63} Further, appellant's intent to possess the foregoing chemicals to manufacture meth was evidenced by his repeated efforts to obtain pseudoephedrine, the active ingredient in meth, between July and late September 2013; his commercial network of associates to obtain even more pseudoephedrine; his paying them for their services in meth, which he carried on him; and his admission on September 26, 2013, after his initial denial, that the meth lab and the acid drain cleaner found in his apartment were his.

{¶64} Appellant argues the evidence was insufficient as to a third count of illegal possession of chemicals and a count of endangering children. However, while appellant was found guilty of these additional offenses, he was not sentenced for them due to the trial court's finding of merger. The Supreme Court of Ohio has defined a conviction as the combined occurrence of a finding of guilty and the imposition of a sentence. *State v. Henderson*, 58 Ohio St.2d 171, 389 (1979). Because appellant was not sentenced on the third illegal possession or child-endangering charges, he was not convicted of them. *State v.Obsaint*, 1st Dist. Hamilton No. C-060629, 2007-Ohio-2661, ¶24; *State v. Williams*, 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶54. We therefore cannot consider them.

18

{¶65} The state's evidence, when taken together and viewed most strongly in favor of the state, was sufficient for the jury to conclude that appellant illegally manufactured meth between September 25, 2013 and September 26, 2013; that he was in possession of Coleman fuel and lithium batteries for the manufacture of meth on August 2, 2013; and that he was in possession of pseudoephedrine for the manufacture of meth between July 1, 2013 and July 31, 2013.

{¶66} **Appellant's Manifest-Weight Challenge**

{¶67} In support of appellant's manifest-weight challenge, he does not point to any conflicts in the evidence, which is the usual basis for such challenge. *State v. Kuscsik*, 11th Dist. Ashtabula No. 2013-A-0058, 2014-Ohio-2697, ¶49. Instead, he makes additional arguments challenging the sufficiency, rather than the weight, of the evidence. For example, as to the manufacturing count, appellant argues that, other than Pierce, no one ever saw appellant at Wooten's apartment and the state did not present any fingerprint evidence to show that meth lab and acid were connected with him. However, Pierce's testimony, if believed, was sufficient to prove appellant lived in Wooten's apartment. *Thompkins*, *supra*.

{¶68} As to the charge of illegal possession of Coleman fuel and lithium batteries, appellant concedes that the K Mart security officer said he bought Coleman fuel and stole lithium batteries from the store, but argues the store video was too grainy to recognize appellant and did not show him stealing the lithium batteries. However, the security officer's testimony, if believed, was sufficient to show that appellant stole the batteries.

19

{¶69} Further, appellant argues that none of the various pharmacists who testified identified him. However, the NPLEX records show that *appellant* made the various purchases of pseudoephedrine. Moreover, Lt. Brown identified appellant on surveillance video showing him buying pseudoephedrine. Finally, appellant argues the evidence was insufficient because no meth was ever found on him. However, Pierce said that appellant often paid him in meth, which he carried on him.

{¶70} In weighing the evidence, the jury was entitled to believe the witnesses presented by the state and to discount appellant's theory that he did not live at the apartment and had no connection to the meth lab found there. After reviewing the record, we cannot conclude the jury lost its way and created such a manifest miscarriage of justice that appellant was entitled to a new trial. We therefore hold the state presented sufficient, credible evidence to support appellant's conviction.

{¶71} For the reasons stated in this opinion, the assignments of error are overruled. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J.,

COLLEEN MARY O'TOOLE, J.,

concur.