OPINION
On December 27, 2000, a Franklin County grand jury issued a four-count indictment against Brett Lamar Dillard[1] and Melvin Anthony Robinson. Mr. Dillard was named in three counts, charged with possession of "crack" cocaine with a firearm specification; carrying a concealed firearm; and, having a weapon while under a disability. Melvin Robinson, was indicted only on a single count of possession of crack cocaine, in violation of R.C. 2925.11, a fourth-degree felony. Ultimately, the co-defendants' cases were severed for trial.
The charges against both men arose as a result of an incident on December 13, 2000, which was initiated by a traffic stop in the area of The Ohio State University campus. The details of the incident are discussed below.
Melvin Robinson's jury trial was conducted in May 2001. The jury returned a guilty verdict and the trial judge proceeded to sentencing immediately thereafter.
Pursuant to an entry journalized May 31, 2001, the judge sentenced Mr. Robinson to a prison term of seventeen months, to be served concurrently with a sentence imposed on a prior conviction.
Melvin A. Robinson (hereinafter "appellant") has timely appealed his conviction, assigning two errors for our consideration:
 I. Melvin Robinson's conviction was based upon insufficient evidence.
 II. Melvin Robinson's conviction was against the manifest weight of the evidence.
Since appellant's assignments of error raise similar issues and require similar analyses, we address them jointly.
Preliminarily, we set forth the similar, yet distinct, standards by which we are bound in reviewing the assignments of error, which challenges both the sufficiency of the evidence, and the manifest weight of the evidence. These standards have long been established and applied by this court.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, `"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of review to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offense of which he was convicted, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
In appellant's assignments of error, he contends that the prosecution failed to prove by sufficient evidence the elements of the offense of which he was convicted, possession of "crack" cocaine. Appellant further contends that this verdict was against the manifest weight of the evidence.
R.C. 2925.11(A) generally prohibits persons from "knowingly obtain[ing], possess[ing], or us[ing] a controlled substance." R.C.2925.11(C)(4) more specifically proscribes the offense of "possession of cocaine." The penalties vary, of course, with the degree of the offense. Felonies of the fourth degree are addressed in R.C.2925.11(C)(4)(b), in pertinent part, as follows:
 If the amount of the drug involved exceeds * * *one gram but does not exceed five grams of crack cocaine, possession of cocaine is a felony of the fourth degree * * *.
Therefore, the prosecution was required to prove that appellant knowingly possessed one to five grams of crack cocaine.
In their respective briefs filed with this court, the prosecution and appellant's counsel concur in summarizing the facts of this case. We nonetheless review the record independently to ascertain the evidence adduced at trial.
The state's first witness was Columbus Police Officer David Shots, who initiated the traffic stop in the campus area of The Ohio State University. Officer Shots testified that on December 13, 2000, at approximately 12:45 a.m., he stopped a vehicle in which appellant was a passenger. According to the officer, he pulled the car over because the vehicle was "backing * * * unsafely," and had a cracked windshield. He identified "Brent Dillard" as the driver. (Tr. 12-13.)
When the officer approached the driver, he "smelled a very strong odor of marijuana coming out of the vehicle." Officer Shots ultimately determined that Mr. Dillard was driving with a suspended driver's license. (Tr. 13-14.)
Other officers arrived on the scene to assist Officer Shots, who immediately arrested Mr. Dillard and put him in the cruiser. Although another officer had more direct contact with appellant, Officer Shots "noticed * * * [appellant] had urinated on himself" and that he was "actually visibly shaking." (Tr. 15.)
Officer Shots testified that the "vehicle had to be impounded" since "[t]here was no operator's license." Therefore, police procedure required that the vehicle be inventoried. (Tr. 16.)
Columbus Police Officer Tim Halbakken was in the same area on patrol that night. He responded to the scene to assist. As did Officer Shots, Officer Halbakken identified appellant as the passenger in the vehicle. Officer Halbakken testified that he first aided Officer Shots in the arrest of the driver, along with Officer Mark Seevers, who also responded to the scene.
Officer Halbakken observed Officers Shots and Seevers remove the driver and passenger (appellant) and place them in their respective cruisers. Officer Halbakken then observed as the other officers searched the vehicle. He saw them "remove * * * drugs and guns" from the vehicle. One gun was found "underneath the [driver's] seat" and "another one from another area of the car in back." Officer Seevers discovered a "baggie of drugs" in a stereo/radio which had been removed from the vehicle's backseat. (Tr. 25-26.)
According to Officer Halbakken, the police initially "were going to release him [appellant]." When appellant was asked whether "there was anything he needed out of the car," appellant responded that there was a cell phone and a jacket. Officer Halbakken testified that appellant then "stopped, and like he was going to say something else, but he was thinking * * *." The officer said, "`Is the stereo yours?' And he [appellant] said, `Yes, the cell phone, jacket and stereo.'" When appellant indicated that the radio was his, he was arrested instead of being released. When appellant apparently realized why the police decided to arrest him, he then claimed that the stereo was not his. No contraband was found on appellant's person. (Tr. 26-27; 35.)
Officer Mark Seevers testified that he also "noticed [a] strong odor of marijuana coming from the vehicle" as he approached it to assist Officer Shots. Officer Seevers also testified that appellant was "acting very nervous, shaking" and he noticed that appellant "had urinated himself" when Seevers patted him down to search for weapons. (Tr. 59.)
Officer Seevers searched the vehicle. He found a "bag of crack cocaine under the driver's seat, a loaded Ruger .40 caliber handgun * * *, a bag of marijuana on the driver's console between the driver and the passenger's seat, and a small [b]aggie of crack cocaine in a cassette player, boom box in the back seat." The officer described how he found the drugs in the "boom box." He testified that when he "* * * pulled the boom box out of the back seat [he] noticed the corner of a small [b]aggie was poking out of the cassette player * * *, and when [he] pressed `eject,' it was inside the actual tape deck." (Tr. 60-61.)
Officer Seevers' testimony regarding the decision to arrest appellant mirrored that of the other police witnesses. All officers who testified on the subject indicated that appellant had not been told that crack cocaine was discovered inside the radio/stereo before he claimed ownership of it; they also agreed that appellant denied ownership of the stereo immediately upon being advised that he was being arrested instead of released.
Kenneth Decker, a detective employed by the Columbus Division of Police, testified regarding his interview with appellant following the arrest. The interview was videotaped and the parties agreed to play the tape for the jury at trial.[2]
Detective Decker testified regarding the laboratory tests conducted on the suspected crack cocaine. According to the detective, the lab verified that the substance was crack cocaine and that it weighed 1.7 grams. The lab was unable to "raise fingerprints" from the baggie in which the drugs were found.
On cross-examination, the detective acknowledged that the taped interview demonstrates appellant's insistence that there had been a "misunderstanding" and that the stereo was not his; at no time during this interview did appellant concede that the stereo was his. The detective also acknowledged again that the police lab found no fingerprints on the baggie; he added that "it doesn't look like" the lab performed any fingerprint testing on the stereo itself. (Tr. 94.)
Appellant testified on his own behalf. His trial counsel first established that appellant had "learning disabilities" and had taken "special classes" to graduate from high school in 1996 at the age of twenty. (Tr. 105.)
Mr. Robinson described the events culminating in his arrest on December 13, 2000. Although he initially testified that his "close friend" Brett Dillard had picked him up "early in the morning" that day, he soon thereafter stated that Dillard picked him up at 9:00 p.m. He recalled that Dillard was pulled over by police because Dillard was "driving backwards because there was a cruiser blocking the street." According to appellant, Dillard was put in a cruiser immediately after telling police that he had no license, and appellant was then "grabbed * * * out the car, patted * * * down, and put * * * in the cruiser." (Tr. 106-108.)
Appellant was soon let out of the cruiser. When an officer asked him if he had all of his property from the car, appellant responded, "my phone and my jacket." According to appellant, the stereo was not his. He did not put the stereo in the car. He did not know that there were drugs in the stereo. Appellant insisted that he never told police that the stereo was his. In fact, he told the officers that the stereo belonged to his cousin or Brett Dillard. (Tr. 109-112.)
On cross-examination, appellant explained that the officers asked him "if * * * [he] wanted to take the radio * * * and [he] said [']I'll take it,[']" but that he "didn't know what was in it." He believed the police were "just trying to give it to [him]." According to appellant, he had no idea why the police decided to arrest him after they had initially indicated they were going to let him go. (Tr. 116-118.)
The defense rested following appellant's testimony.
Following several hours of deliberations, the jury asked to review a portion of the videotaped police interview. The record indicates that the tape was replayed, and the jury returned to deliberate. The record then reveals that the jury indicated to the court that it was deadlocked. The trial judge "read them the Howard charge" to urge the jury to attempt again to reach a unanimous verdict. A few hours later, the jury rendered its guilty verdict. (Tr. 165-168.)
On appeal, appellant contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. His argument in its entirety rests upon his position that there was "no physical evidence" and the "only evidence" was "his own nervous, disjointed, illogical, and contradictory statements to the officers at the scene." Appellant characterizes his admission to police about owning the stereo as an "initial misstatement" and emphasizes that he "immediately retracted and corrected" it. (Brief at 6.) Accordingly, appellant contends, the jury must have "lost its way," particularly in light of the jury's initial indication that it was deadlocked.
The above argument advanced by appellant is essentially one which seeks to attack credibility, which determination is properly within the province of the jury as the factfinder. See Thompkins, supra, at 387. In finding appellant guilty, the jury ultimately resolved any conflicting testimony in favor of the prosecution. Since the prosecution presented evidence which, if believed, establishes the elements of the offense, we cannot simply substitute our judgment for that of the jury.
The prosecution responds that the "real" issue here is a question of law — whether the state established that appellant had possession, actual or constructive, of the cocaine.
R.C. 2925.01(K) defines "possess" or "possession" as follows:
 "Possess" or "possession" means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through which ownership or occupation of the premises upon which the thing or substance is found.
In State v. Barr (1993), 86 Ohio App.3d 227, the Cuyahoga County Court of Appeals discussed the well-established law pertaining to the "possession" provision (former R.C. 2925.01[L]):
 Possession may be actual or constructive. State v. Haynes (1971), 25 Ohio St.2d 264 * * *. To place a defendant in constructive possession, the evidence must demonstrate that the defendant was able to exercise dominion or control over the items. State v. Wolery (1976), 46 Ohio St.2d 316 * * *. Moreover, readily usable drugs found in very close proximity to a defendant may constitute circumstantial evidence and support a conclusion that the defendant had constructive possession of such drugs. State v. Pruitt (1984), 18 Ohio App.3d 50.
In this case, we note that the jury was instructed correctly on the issue of constructive possession, with the trial judge using precisely the same pertinent language as that quoted above. (Tr. 156.)
We agree with the prosecution that the state presented sufficient circumstantial evidence for the jury to conclude that appellant had constructive possession of the cocaine.
While we cannot say that the evidence presented here was overwhelming, such is not the test or standard by which we are bound in reviewing the evidence and the jury's resolution of conflicting testimony.
Given the state of this record, appellant's conviction for cocaine possession was supported by sufficient evidence, and the conviction was not against the manifest weight of the evidence.
The first and second assignments of error are overruled.
Having overruled the assignments of error, the judgment of the trial court is affirmed.
Judgment affirmed.
LAZARUS and BRYANT, JJ., concur.
[1] Throughout the trial transcript in the instant case, Mr. Dillard's first name is referenced variously as "Brent or Brett."
[2] Neither the tape nor a transcript of the tape is part of the record.