OPINION *Page 2 
{¶ 1} Defendant-appellant Joseph Hupp appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of trafficking in cocaine, one count of possession of cocaine, one count of felonious assault with a firearm specification, one count of trafficking in marijuana and one count of possession of marijuana. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On January 8, 2007, the Stark County Grand Jury indicted appellant on one count of trafficking in cocaine in violation of R.C.2925.03(A)(2)(C)(4)(f), a felony of the first degree, one count of possession of cocaine in violation of R.C. 2925.11(A)(C)(4)(e), a felony of the first degree, one count of felonious assault in violation of R.C.2903.11(A)(2), a felony of the second degree, and one count of improperly discharging a firearm at or into a habitation in violation of R.C.2923.161(A)(1), a felony of the first degree. Appellant also was indicted on one count of having a weapon while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree, one count of trafficking in marijuana in violation of R.C. 2925.03(A)(2)(C)(3)(c), a felony of the third degree, and one count of possession of marijuana in violation of R.C. 2925.11(A)(C)(3)(c), a felony of the fifth degree. The indictment also contained two firearm specifications. At his arraignment on January 12, 2007, appellant entered a plea of not guilty to the charges contained in the indictment.
 {¶ 3} Prior to trial, appellant entered a plea of guilty to having a weapon while under disability. The remaining charges then proceeded to jury trial. The following evidence was adduced at trial. *Page 3 
 {¶ 4} Jennifer Judy is the mother of Amanda Judy [hereinafter "Amanda"], who used to date appellant. Jennifer Judy testified that, on November 30, 2006, Amanda was living on Robin Court with appellant and her two children and that they had been living there for two weeks. She further testified that, when she called her daughter at that address, appellant answered the telephone a few times. Jennifer Judy further testified that she believed that appellant was living at the Robin Court address because she had seen him wrapped in a towel a couple of times when she was there.
 {¶ 5} On November 30, 2006, Jennifer Judy was at Sandra Mayle's apartment when Amanda came in crying and upset over an incident involving appellant. Amanda asked if she could stay at Sandra Mayle's house. Jennifer Judy testified that she then went downstairs to confront appellant based on what her daughter had told her. As Jennifer Judy was standing in the yard, she could see appellant sitting outside the apartment in his van.
 {¶ 6} Jennifer Judy testified that after she confronted appellant "about him putting his hands on my daughter," appellant shot a gun off in the air, got out of the van and chased her while threatening to kill her. Transcript, Vol. II at 53. Jennifer Judy further testified that appellant chased her up the stairs to Mayle's apartment and that she ran to the bathroom in the apartment, which was occupied by Kayla Seidel, and pounded on the door. After Kayla unlocked the door, Jennifer Judy went into the bathroom and locked the door.
 {¶ 7} At trial, Kayla Seidel testified that she was at Sandra Mayle's apartment on November 30, 2006, when Amanda came in crying and upset saying that she needed a place to hide. Kayla Seidel testified that Amanda told her mother, Jennifer *Page 4 
Judy, not to go downstairs, but that Jennifer Judy "went down there and all I heard was her and Joe [appellant] arguing, I heard the two gunshots outside." Transcript, Vol. II at 20. She further testified that after Jennifer Judy ran up the stairs to the apartment, there was a gunshot in the hallway. Kayla Seidel testified that she then went into the bathroom to hide and that Jennifer Judy followed her into the bathroom.
 {¶ 8} The next witness to testify at trial was Sandra Mayle. Mayle testified that, at approximately 5:30 p.m. on November 30, 2006, Amanda came to her house crying hysterically. Mayle also testified that Jennifer Judy, Amanda's mother, then ran downstairs after talking with Amanda, and that she came running back upstairs a few minutes later with appellant following her. The following testimony was adduced when Mayle was asked whether she had heard anyone before Jennifer Judy came running up the stairs:
 {¶ 9} "A. There was like firecracker — sounded like firecrackers outside, but I didn't really hear it hear it because I don't have good hearing, but I heard something.
 {¶ 10} "Q. Shortly after that, did Jenny run upstairs?
 {¶ 11} "A. Yeah. She came —
 {¶ 12} "Q. Was anybody behind her as she came running upstairs?
 {¶ 13} "A. Yeah, Joe.
 {¶ 14} "Q. What happened?
 {¶ 15} "A. Well, he come up and he was standing there and then she had run to the bathroom, and Kayla's mom was at the doorway as you come around, she was like looking like that. And they went back in the kitchen and we was just sitting there like, wow, you know. But all the kids was in the room, I was in the room, Shannon was in the *Page 5 
room. I think all the kids was, and he was standing there and he was yelling at her, calling her something, I think it was bitch.
 {¶ 16} "Q. Yelling at who?
 {¶ 17} "A. Jenny." Transcript, Vol. II at 40-41.
 {¶ 18} Mayle further testified that appellant was right behind Jennifer Judy and that he appeared to have a gun in his hand.
 {¶ 19} Rose Seidel, Kayla's mother, also testified at trial. Rose Seidel testified that she was at Sandra Mayle's apartment on November 30, 2006, when Amanda came in crying. Rose Seidel testified that after Jennifer Judy confronted appellant, appellant started chasing Jennifer Judy and started shooting at her while saying "no fucking bitch is going to do this to me." Transcript, Vol. II at 72. Rose Seidel testified that as appellant was chasing Jennifer Judy, she heard three shots. She further testified that she then called 911 using her cell phone and that appellant got into his vehicle and left. When asked what kind of gun appellant had, Seidel testified that she believed the gun, which she had seen while appellant ran up the stairs, was a revolver.
 {¶ 20} Shannon Poling, Sandra Mayle's daughter, testified that she was living with her mother on November 30, 2006, and was present when Amanda arrived at the apartment crying. Poling testified that she was watching from a window when Jennifer Judy went down to confront appellant and that she saw appellant exit his van with a gun in his hands and shoot into the air. Poling further testified that appellant then started chasing Jennifer Judy with the gun in his hand.
 {¶ 21} At trial, Sergeant Roger Croston of the Canton Police Department testified that on November 30, 2006, he responded to a domestic violence call at 1476 Robin *Page 6 
Court, S.E. According to the dispatcher, the incident involved appellant and Amanda Judy. Sergeant Croston testified that after no one responded after he and other officers on the scene knocked on the door at the Robin Court address, he continued patrolling the area. According to the Sergeant, approximately 20 or 30 minutes later, another call came through dispatch mentioning appellant and indicating that shots had been fired. Sergeant Croston then returned to the Robin Court address and sat in his cruiser while waiting to see if anything happened. After appellant arrived on the scene, he was arrested and his van was inventoried. The inventory yielded a .357 bullet, but no gun was found inside the van.
 {¶ 22} Officer Joseph Mongold of the Canton Police Department also testified at trial. Officer Mongold testified that, on November 30, 2006 at approximately 5:30 p.m., he received a call indicating that appellant had fired shots. Officer Mongold, along with other officers, then proceeded to Robin Court, S.E. and observed appellant driving in a van. After appellant was arrested, Officer Mongold went to Sandra Mayle's address on Greenfield Avenue, S.W. to talk to Jennifer Judy and the witnesses. The following is an excerpt from Officer Mongold's testimony:
 {¶ 23} "Q. While you're there at the scene, tell the jury what you do aside from talking to the people there while you're there at the scene.
 {¶ 24} "A. When we responded, as I walked up towards the residence, I could see markings on the siding or on the side of the residence, the same type of markings or damages to the siding that I have observed in other types of shooting in habitation cases. I also noticed a marking on the door of the residence, as if the door was open, that I believe to be cause by a bullet being fired at the door. *Page 7 
 {¶ 25} "Q. What else did you notice at the apartment?
 {¶ 26} "A. On that specific date, sir?
 {¶ 27} "Q. On that day.
 {¶ 28} "A. The steps and the staircase going up to the upstairs apartment, which is where I was going, I noticed a hole in the ceiling that was very cylindrical, round. It did not, in my personal opinion, appear to be any type of bullet hole, it appeared to be smaller than that. And I did observe a hole in the floor, the landing at the bottom of the stairs, which did appear to me to be some type of bullet hole." Transcript, Vol. II at 123-124.
 {¶ 29} After talking with Amanda Judy, Officer Mongold returned to the Robin Court address with her. Officer Mongold testified that Amanda gave him permission to go into and search the house. Once inside the house, Amanda took Officer Mongold to the upstairs bedroom area when he found a large blanket with marijuana buds drying on the same and a large quantity of crack cocaine in plastic bags and over $600.00 behind a mattress on the floor. The officer testified that Amanda also took him to the kitchen area where he found a pot with white residue on it. Officer Mongold testified that he found a digital scale used to weigh out crack cocaine in the bedroom, a box of ammunition hidden in the furnace room and baggies, scissors and rolling papers. When asked how he got into the house on Robin Court, Officer Mongold testified that he used a key that had been taken from appellant's key ring.
 {¶ 30} On cross-examination, Officer Mongold testified that when he first heard appellant's name, his inclination was to go to an address on Park S.W. because, based on his prior involvement with appellant, he believed that appellant lived there. He further *Page 8 
testified that after using appellant's key to gain entry into the Robin Court address, he turned the key over to Amanda Judy. Officer Mongold further testified on cross-examination that he believed that appellant lived at the Robin Court apartment, although he did not find any clothing or mail or other items belonging to appellant at the address. The officer also testified that appellant gave an officer the Park Avenue address at his booking into the jail.
 {¶ 31} Brad Taylor of the Stark County Crime Lab testified that the white residue found on the plate and the cash seized from the Robin Court address testified positive for traces of crack cocaine. He further testified that the buds testified positive for marijuana and that there were 290.2 grams of marijuana. According to Taylor, the white substance found in baggies in the bedroom tested positive for crack cocaine and that the crack cocaine weighed 42.19 grams.
 {¶ 32} The final witness to testify at trial was Michael Short of the Stark County Crime Lab. Short testified that the bullet found in appellant's van was a live cartridge and was a .357 Magnum caliber PMC brand. Short further testified that, although he attempted to examine the bullet for fingerprints, "[t]here were no impressions of comparison value developed on the case or the bullet itself." Transcript, Vol. II at 201.
 {¶ 33} At the conclusion of the evidence and the end of deliberations, the jury, on February 15, 2007, found appellant guilty of trafficking in cocaine, possession of cocaine, felonious assault with a firearm specification, trafficking in marijuana and possession of marijuana. The jury found appellant not guilty of improperly discharging a firearm at or into a habitation. As memorialized in a Judgment Entry filed on March 2, 2007, appellant was sentenced to an aggregate prison sentence of fifteen (15) years. *Page 9 
 {¶ 34} Appellant now raises the following assignments of error on appeal:
 {¶ 35} "I. WHETHER THE JURY VERDICT FINDING APPELLANT GUILTY OF TRAFFICKING IN COCAINE, POSSESSION OF COCAINE, TRAFFICKING IN MARIJUANA AND POSSESSION OF MARIJUANA WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THEFOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
 {¶ 36} "II. WHETHER THE JURY VERDICT FINDING APPELLANT GUILTY OF FELONIOUS ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 I, II {¶ 37} Appellant, in his first assignment of error, argues that his convictions for trafficking in cocaine, possession of cocaine, trafficking in marijuana and possession of marijuana were against the manifest weight of the evidence. In his second assignment of error, appellant argues that his conviction for felonious assault was against the manifest weight of the evidence.
 {¶ 38} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N.E.2d 541, *Page 10 
superseded by constitutional amendment on other grounds as stated byState v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. In effect, the appellate court sits as a "thirteenth juror" and "disagrees with the fact finder's resolution of the conflicting testimony."Thompkins at 387. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, syllabus 1.
 {¶ 39} With respect to the drug offenses, appellant specifically argues that there was not proof beyond a reasonable doubt that the marijuana and cocaine found at the Robin Court address belonged to him. Appellant contends that there was no evidence that he lived at the Robin Court address where the drugs were found and that, therefore, the jury lost its way in concluding that there was proof beyond a reasonable doubt that he was in possession of the drugs. We agree.
 {¶ 40} Possession may be actual or constructive. State v.Hankerson (1982), 70 Ohio St.2d 87, 434 N.E.2d 1362, syllabus. To establish constructive possession, the evidence must prove that the defendant was able to exercise dominion and control over the contraband.State v. Wolery (1976), 46 Ohio St.2d 316, 332, 348 N.E.2d 351. Dominion and control may be proven by circumstantial evidence alone. State v.Trembly, 137 Ohio App.3d 134, 738 N.E.2d 93. Circumstantial evidence that the defendant was located in very close proximity to readily usable drugs may show constructive possession. State v. Barr (1993),86 Ohio App.3d 227, 235, 620 N .E.2d 242, 247-248; State v. Morales, Licking App. No. 2004 CA 68, 2005-Ohio-4714 at ¶ 50; State v. Moses, Stark App. No. 2003CA00384, 2004-Ohio-4943 at ¶ 9. Ownership of *Page 11 
the drugs need not be established for constructive possession. State v.Smith, Summit App. No. 20885, 2002-Ohio-3034, at ¶ 13, citing State v.Mann, (1993) 93 Ohio App.3d 301, 308, 638 N.E.2d 585. Furthermore, possession may be individual or joint. Wolery, 46 Ohio St.2d at 332,348 N.E.2d 351.
 {¶ 41} At the trial in this matter, Officer Mongold testified that he used a key from appellant's key ring to gain entry to the Robin Court apartment because Amanda Judy, who did not testify at trial, did not have a key on her person. The key, which was turned over to Amanda Judy, was not produced at trial. Officer Mongold testified that, once in the apartment, he did not see or collect anything that would indicate that appellant was a resident of the apartment. The following is an excerpt from Officer Mongold's testimony on cross-examination:
 {¶ 42} "Q. So what items did you retrieve from that apartment that this jury can look at that would indicate that he [appellant] lived there? For instance, what clothing of his did you recover from the apartment?
 {¶ 43} "A. The only thing that the jury could physically see or listen to would be a 911 call [the domestic violence call] that came in prior to this incident.
 {¶ 44} "Q. Okay. Did you find any clothing in the apartment that belonged to Joseph Hupp that you collected as evidence?
 {¶ 45} "A. No, sir.
 {¶ 46} "Q. Did you find any mail in the apartment that belonged to Joseph Hupp that you collected as evidence?
 {¶ 47} "A. No, sir, I did not. *Page 12 
 {¶ 48} "Q. Did you find any personal hygiene, deodorant, shaving equipment, shaving cream, anything that would indicate belonged to Joseph Hupp that you collected from that apartment?
 {¶ 49} "A. Items were located, like clothing items, but were not collected, sir.
 {¶ 50} "Q. Why not?
 {¶ 51} "A. They weren't — I didn't feel them to be of evidential value at the time of the case, sir." Transcript, Vol. II at 168-169. The clothes, according to the officer, were male clothes. There was no testimony, however, that they belonged to appellant. Officer Mongold agreed that he did not see or collect anything that indicated appellant was a resident of the apartment.
 {¶ 52} Officer Mongold further testified that, after the incident involving appellant, his first inclination was to go to a Park Avenue address because, based on his prior dealings with appellant, he believed that appellant resided on Park Avenue. Testimony was adduced at trial that appellant gave such address to police at the time he was booked.
 {¶ 53} While Jennifer Judy, Amanda's mother, testified that she believed that appellant lived with Amanda at the Robin Court apartment, on cross-examination, she testified that the only items that she saw in the apartment belonging to appellant were a DVD player and a karaoke machine. She further testified that she never saw any of appellant's clothing at the apartment and that she did not like appellant. The following testimony was adduced on cross-examination: *Page 13 
 {¶ 54} "Q. If somebody doesn't have clothing in an apartment, is that part of the criteria that somebody doesn't live there? Like Sandy [Mayle] doesn't live in your apartment because she doesn't have clothing?
 {¶ 55} "A. Not necessarily. If Sandy didn't have clothes at my house and she was there every day, I would still say she lives there.
 {¶ 56} "Q. But does Sandy live with you?
 {¶ 57} "A. Part-time. Part of the time, yeah, a couple days out of the week.
 {¶ 58} "Q. So it's possible then that Joe lived in that house part-time?
 {¶ 59} "A. I say full-time.
 {¶ 60} "Q. Okay. Because Amanda is your daughter?
 {¶ 61} "A. Yeah, and he was there every day.
 {¶ 62} "Q. Were you there every day?
 {¶ 63} "A. No.
 {¶ 64} "Q. Okay. Then you don't know if he was there every day?
 {¶ 65} "A. Well, when I called —
 {¶ 66} "Q. Did you call every day?
 {¶ 67} "A. Just about.
 {¶ 68} "Q. Okay. Well, how often — you said the phone was often disconnected.
 {¶ 69} "A. Wasn't disconnected, they shut it off. You know, like on the phone, the ringer.
 {¶ 70} "Q. So you couldn't call every day if the ringer was shut off?
 {¶ 71} "A. I still called every day. At least once a day, if not every day." Transcript, Vol. II at 67-68. *Page 14 
 {¶ 72} Amanda Judy did not testify at trial.
 {¶ 73} Based on the foregoing, we find that the jury's verdict on the drug charges was against the manifest weight of the evidence. There was a lack of credible evidence that appellant lived at the Robin Court apartment and thus was in possession either actual or constructive, of the drugs found there.
 {¶ 74} We find that the jury lost its way in concluding that the drugs were possessed by appellant and that appellant, therefore, was guilty of trafficking in cocaine, marijuana and possession of marijuana and cocaine. However, while we find that appellant's conviction on the drug charges was against the manifest weight of the evidence, we find that appellant's conviction for felonious assault was not against the manifest weight of the evidence.
 {¶ 75} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(2). Such section provides that "[n]o person shall knowingly . . . cause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordinance."
 {¶ 76} Appellant, in support of his argument that his conviction for felonious assault was against the manifest weight of the evidence, argues that there was no evidence that he shot at a person, only that he shot into the air. Appellant also notes that the gun was never recovered and that no gunshot residue test was performed on him or fingerprints found on the bullet. Finally, appellant contends that Officer Mongold, during cross-examination, admitted that the marks on the exterior of the house could have been caused by something other than a bullet. *Page 15 
 {¶ 77} However, as is set forth in detail above, Jennifer Judy testified that, after firing the gun into the air, appellant started chasing her while threatening to kill her. Testimony was adduced at trial that appellant fired the gun again while pursuing Jennifer Judy. In addition, Kayla Seidel testified that she heard two shots outside while Sandra Mayle testified that, before Jennifer Judy ran up the stairs, she heard what sounded like firecrackers. Mayle further testified that she observed appellant chase Jennifer Judy with what appeared to be a gun in his hand while calling her a "bitch." Rose Seidel testified that, as he chased Jennifer Judy, appellant said "no fucking bitch is going to do this to me." Transcript, Vol. II at 72. She testified that she saw a silver gun in appellant's hand. Shannon Poling also testified that, after shooting the gun into the air, appellant started chasing Jennifer Judy. According to Poling, appellant "was pointing it [the gun] around mostly toward where Jenny ran saying that he was going to kill that bitch." Transcript, Vol. II at 87.
 {¶ 78} Moreover, Officer Mongold testified that he found a bullet hole in the floor of the landing leading up to Sandra Mayle's apartment and that the bullet hole went into the basement.
 {¶ 79} Based on the foregoing, we find, after examining the entire record, we cannot say that the jury, as trier of fact, clearly lost its way and created a manifest miscarriage of justice in convicting appellant of felonious assault. *Page 16 
 {¶ 80} For the foregoing reasons, appellant's first assignment of error is sustained while his second assignment of error is overruled.
 {¶ 81} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed in part and reversed in part.
By: Edwards, J. Hoffman, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed in part and reversed and remanded in part. Costs assessed to appellant. *Page 17