[Cite as *State v. Sunday*, 2014-Ohio-900.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 13CA19 |
| | : | |
| vs. | : | |
| | : | DECISION AND JUDGMENT |
| JOSHUA D. SUNDAY, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | **Released: 03/05/14** |

APPEARANCES:

Jeremiah J. Spires, Lancaster, Ohio, for Appellant.

Judy C. Wolford, Pickaway County Prosecuting Attorney, Circleville, Ohio, for Appellee.

McFarland, J.

**{¶1}** Joshua D. Sunday, (Appellant), appeals his conviction in the Pickaway County Court of Common Pleas on two counts: (Count One), illegal assembly or possession of chemicals for the manufacture of drugs, R.C. 2925.041(A), a felony of the third degree; and (Count Two), illegal manufacture of drugs or cultivation of marihuana, R.C. 2925,04(A)/(C)(2)(a), a felony of the second degree.  Appellant contends the verdicts are against the manifest weight of the evidence because the prosecution failed to prove Appellant participated in the illegal assembly or possession of chemicals used for the illegal possession of drugs.  Having reviewed

the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we find the greater amount of credible evidence supports the verdicts. As such, we overrule Appellant's assignment of error and affirm the judgment of the trial court.

## FACTS

{¶2} The Appellant was indicted by the Pickaway County Grand Jury on two counts: (Count One), illegal assembly or possession of chemicals for the manufacture of drugs, R.C. 2925.041(A); and, (Count Two), illegal manufacture of drugs or cultivation of marihuana, R.C. 2925.04(A)/(C) (2)(a). The charges arose from events which transpired on November 9, 2012, during a routine probation check at a small upstairs apartment on Watt Street in Circleville, Ohio.

{¶3} When Probation Officer Jason Williams conducted the random probation check of his probationer Kenneth Gasmire's (Gasmire) residence at approximately 9:00 p.m., he encountered Gasmire, Richard Paskins (Paskins), Appellant, and Appellant's son, Tyler Sunday (Tyler). Officer Williams discovered various items recognized for use of the manufacture of crystal methamphetamine. He requested additional assistance from the Circleville Police Department. Williams and other officers concluded that crystal methamphetamine had been manufactured previously in the house and the occupants were preparing to "cook" or "make" more of the controlled substance. Two pairs of pliers found

were later sent to the Bureau of Identification and Investigation in London, Ohio.

A black-handled pair of pliers was found to have residue of pseudoephedrine on it.

All 4 persons, Gasmire, Paskins, Appellant and his son were charged in the

incident.

{¶4} Appellant was arraigned on December 12, 2012 and entered a plea of

not guilty.  He was allowed to sign a recognizance bond in the amount of

$100,000.00. Appellant was assigned appointed counsel.

{¶5} Appellant eventually proceeded to a jury trial on April 29, 2013.  At

the beginning of trial the parties stipulated that methamphetamine is a Schedule II

controlled substance and also stipulated to the chain of custody and analysis as to

the two sets of pliers submitted for forensic analysis.  Both co-defendants Gasmire

and Paskins testified against Appellant.  The jury returned verdicts of guilty on

both charges.

{¶6} Appellant was sentenced on July 17, 2013.  The trial court merged the

two counts for sentencing purposes and the prosecution elected to proceed on

Count Two, the second degree felony.  Appellant was ordered to serve four years

of incarceration.  Appellant was given credit for time served and court costs were

waived.  Appellant's driver's license was also suspended for a short time.

Appellant has filed a timely appeal.

Where relevant, additional facts are set forth below.

ASSIGNMENT OF ERROR

I. THE VERDICTS ARE AGAINST THE WEIGHT OF THE EVIDENCE.

STANDARD OF REVIEW

{¶7} Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Williams,* 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶28, citing *State v. Thompkins,* 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Our role is to determine whether the evidence produced at trial attains the high degree of probative force and certainty required of a criminal conviction. *State v. Hayslip,* 4th Dist. Adams No. 05CA812, 2006-Ohio-3120, ¶8, citing *State v. Getsy,* 84 Ohio St. 3d 180, 193, 702 N.E.2d 866 (1998). In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Williams, supra,* citing *Thompkins, supra*; *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. *Id.* We cannot reverse a conviction where the state has presented substantial

evidence so that a reasonable trier of fact could conclude that all of the essential elements of the offense were established beyond a reasonable doubt. *Williams, supra*; *Getsy, supra* at 193-194. We are also guided by the presumption that the trier of fact "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony." *Williams, supra*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St. 3d 77, 80, 461 N.E.2d 1273 (1984).

## LEGAL ANALYSIS

{¶8} Appellant argues the evidence at trial proved only that Appellant was one of four people who had recently resided in the house, but "stopped short" of establishing that Appellant in any way participated in the illegal assembly or possession of the chemicals used for the illegal manufacture of drugs. Appellant contends the testimony failed to explicitly implicate or identify him by name in any of the prohibited actions. Appellant also discredits the damaging testimony given against him by two of his co-defendants, Gasmire and Paskins.

{¶9} Appellant argues the State failed to introduce any evidence that implicated him individually as to any of the elements of the crimes charged. He points to instances in the testimony where the word "they" or "them" was used to

identify the persons making the methamphetamine.  In Count One, Appellant was

charged with a violation of R.C. 2925.041(A), which provides:

> "No person shall knowingly assemble or possess one or more
> chemicals that may be used to manufacture a controlled substance in
> Schedule I or II with the intent to manufacture a controlled substance
> in Schedule I or II."

In Count Two, Appellant was charged with a violation of R.C.

2925.04(A)/(C)(2)(a), which provided that "No person shall knowingly

manufacture or otherwise engage in any part of the production of a

controlled substance."

{¶10}  At trial, Officer Williams testified Gasmire answered the door on the

night in question.[1]  Appellant and his son Tyler were both sitting at a kitchen table

in the back side of the living room.  Paskins had been in the bathroom.  Williams

talked to Gasmire for a few minutes and began searching the small one bedroom

apartment.[2]  Williams discovered a grocery bag at the end of the apartment's

hallway against the wall.  Williams testified the bag was closest to the persons

sitting at the table.  Williams opened the bag and noticed Coleman camping fuel,

Lightning Drain Opener, a Morton Salt container, and black and yellow-handled

pliers.  Williams testified that the items in the bag were "normal indicators" of

materials used to manufacture methamphetamine.  Williams also indicated there

---

[1] Williams testified other police personnel, Chief Gray, Officer McGowan, and Officer Messick went with him into the apartment.  Two other officers waited outside.

[2] Williams further clarified that as one of the terms of Gasmire's probation, his apartment could be searched at any time without a search warrant.

were two pairs of pliers, a set in the bag and a set in the kitchen. He notified the police department and requested assistance. Williams subsequently found a box of instant cold pain relief and a pair of black-handled pliers under the kitchen sink. Lithium batteries were found on the kitchen table where Appellant was sitting, and a few feet from the other items. Other lithium batteries were found on a shelf in the hallway. Williams identified all these items at trial. On cross-examination, Officer Williams acknowledged there was no foul odor, generally associated with manufacturing methamphetamine, present in the apartment on the date in question.

{¶11} Officer Doug Anderson next testified he was dispatched to the Watt Street apartment for assistance. Officer Anderson also saw the grocery bag and identified the items inside the bag, as well as the batteries on the kitchen table. Officer Anderson testified past experience and training indicated to him that the items were used for the manufacture of methamphetamine. Anderson testified upon being shown the black-handled pliers at the scene, he noticed they had a powdery residue on the plier portion, as if they had been used to crush something. He further testified Paskins approached him and indicated he wanted help with his drug problem. On cross-examination, Anderson admitted Appellant was not discovered in the kitchen where the pliers were located.

{¶12} The next State's witness, Detective Phillip Roar testified he was dispatched to the Watt Street apartment upon a report that items appearing to be

"precursors" for the manufacture of crystal methamphetamine had been discovered. When he arrived, the bag and the articles found inside the apartment had been removed to the sidewalk. Roar testified everything collected was entered into evidence. He submitted both pairs of pliers to BCI.[3] Roar testified the scene did not indicate that an active methamphetamine lab was there.

{¶13} Kenneth Gasmire also testified on behalf of the prosecution. He testified the other individuals and a woman named Lola Spaulding had been living with him at the Watt Street apartment, on and off, for about two weeks. When the officers arrived, Gasmire was laying on the living room floor. He testified Tyler Sunday was in the bedroom and Appellant was in the front room at the kitchen table. Gasmire approached Officer Williams because he was concerned others were making "crystal meth" in his apartment, but he denied participation. Gasmire testified as follows:

> Q.    Now you indicated to Jason that you were concerned about
> them making crystal meth. How did you know that's what they were
> doing?
>
> A.    I saw them.
>
> * * *
>
> Q.    Compared to November the 9th at 9:00 o'clock, when was this
> foul odor that was in the house? The same day, a different day?

---

[3] BCI is the Ohio Bureau of Criminal Investigation. BCI has a laboratory and performs forensic evidence and verification work in drug cases.

A.     Same day.

Q.     Earlier in the day?

A.     Yes, mam.

Q.     Approximately what time, if you recall?

A.     All four people were in there at the same time.

Q.     When you say all four, does that include you?

A.     Includes myself.

* * *

Q.     What about the other ingredients that were used to make the methamphetamine. Were they crushing up some pills?

A.     Again, Sudafed, Josh Taylor [sic] had Sudafed, but there was a plastic green bag that had stuff in it.

Q.     So they made it before, they had crushed up Sudafed before?

A.     Yes mam.
Q.     What happened to that?

A.     Josh Sunday had that and Tyler had that little plastic bag.

Q.     When they made meth the first time, where did they make it?

A.     At the kitchen table.

{¶14} Gasmire also testified when the others made meth earlier, "they" used a Pepsi or Coke bottle. He testified he dumped the bottle used when taking out the trash.

{¶15} Gasmire admitted he also had the same two charges pending against him as did Appellant, and had not yet entered a plea.[4] He testified he had not been promised anything in return for his testimony. Gasmire admitted he had prior felonies and testified the pliers, the black pair and the yellow and black pair were his tools. He also testified "they" told him they were using the black- handled pair to crush Sudafed upstairs. Gasmire denied helping them. On cross-examination, Gasmire admitted he never reported the presence of the other individuals and never asked for assistance in removing the individuals living at his apartment. Gasmire further testified as follows:

> Q.    Okay. You indicated that there was cooking methamphetamine earlier that particular day?
>
> A.    No, sir. I had used crystal meth to try it out that day. Been cooking earlier that- - earlier that evening.
>
> Q.    Okay. So are you saying that these same individuals cooked it in your apartment some time prior to this?
>
> A,    Right, I come home and came into it.
>
> Q.    When was that?
>
> A.    About 5:00 that evening….

{¶16} The final State's witness was Richard Paskins. Paskins testified he had known Appellant and his son for approximately 20 years. On November 9,

---

[4] On redirect examination, Gasmire testified he had been in the V.A. drug and alcohol program in Chillicothe and was "clean" at the time he testified.

2012, he was at Gasmire's apartment all day, except for leaving to go to Walmart to purchase the chemicals to make methamphetamine. Using Gasmire's truck, Paskins, Appellant and Tyler went to Walmart.  Appellant drove the truck.  Paskins denied purchasing the drain cleaner, salt, and camping fuel.   He was barred from going in to Walmart, so he remained in the truck with Appellant.  Tyler Sunday and Chase Cookson[5] bought the items.  That same day "some girl" bought the Sudafed/cold pack at CVS.  Paskins testified the persons in the truck all knew why they had gone to Walmart and were in agreement on what was being purchased.[6]

{¶17}  Paskins denied being involved in "making meth."  He testified as follows:

> Q.      Did you get a chance to make anything on the 9th before everbody come around?
>
> A.      No.
>
> Q.      Had you started the process where somebody was crushing up pills or anything like that?
>
> A.      No.  Tyler and Josh crushed the pills.
>
> Q.      Had that been started, started a new batch of meth?
>
> A.      Yes.
>
> Q.      When?  The day you got arrested?
>
> A.      Yes.

---

[5] Paskins testified Cookson is Appellant's step-son.
[6] Paskins did not use the above wording, but answered affirmatively to the prosecutor's questions.

\* \* \*

Q.     All right. Do you know what happened to the Sudafed pills that got crushed up?

A.     No, I don't know.  Not when the probation officer comes in and the cops and after that time I don't know where the Sudafed pills went?

Q.     Who crushed them up?

A.     Tyler and Josh did.

\* \* \*

Q.     Do you're saying that at 8:00 o'clock that night, just an hour before the police came, you went to Walmart to get these chemicals?

A.     Yes.

Q.     You used Kenny's truck and Josh stayed in the truck with you?

A.     Yes.

Q.     And you sent in- - who went in?

A.     Tyler and Chase Cookson.

Q.     Okay. And they brought this shopping list of items.

A.     Yes.

Q.     But the Sudafed you said had to be signed for; is that correct?

A.     Um-hum.

Q.     So and that was - - those are the pills being crushed up that night?

A.     Yes.

Q.     How did those come in to that particular apartment, if you know?  You said a girl, a woman?

A.      Yeah. Josh and Tyler had the pills.

* * *

Q.      And you indicated that somebody was crushing pills.  Did you
see anybody crushing pills?

A.      Tyler Sunday and Josh.

Q.      Where were they located when they were doing that?

A.      Kitchen table.

Q.      Okay. Around the kitchen table?

A.      Yeah.

Q.      And that was just before the parole, excuse me, the probation
officers arrived?

A.      Yes.

Paskins testified the black-handled pliers were used to crush the pills.

{¶18}  On cross-examination, Paskins admitted telling an officer he was a
drug addict, wanted rehab, and wanted to cooperate.  Paskins identified a letter he
wrote while in jail to Detective Roar.  Paskins read the letter aloud to the jury in
which he repeatedly begged to get out of jail, go to rehab, and offered to testify
against Appellant or otherwise help the police Paskins admitted the focus of the
letter was to testify against Appellant, not the other two co-defendants.  He
admitted he had entered a plea in the case and had been sentenced to a drug

rehabilitation program.  On re-direct examination, Paskins testified he also offered to testify against Tyler Sunday.

{¶19}  Detective Roar was recalled as a witness.  He testified he was never able to identify who purchased the Sudafed or pinpoint when it had been purchased.  Roar also identified photographs of the items obtained at Gasmire's house.  The black-handled pliers were sent to BCI with a request to check the residue on them.   BCI's lab report indicated the black-handled pliers contained a trace amount of pseudoephedrine.  On cross-examination, Detective Roar acknowledged he never heard about Chase Cookson's involvement until the trial.

{¶20}  Possession of a controlled substance may be actual or constructive.  *State v. Williams,* 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶23.  See *State v. Wolery,* 46 Ohio St. 2d 316, 329, 348 N.E.2d 351(1976) (Internal citations omitted.).  A person has "actual possession" of an item if the item is within his immediate physical possession.  *Williams, supra*, citing *State v. Fugate,* 4th Dist.Washington No. 97CA2546, 1998 WL 729221, *7.  "Constructive possession" exists when an individual is able to exercise domination and control over an item, even if the individual does not have immediate physical possession of it.  *Williams, supra*, citing *State v. Hankerson,* 70 Ohio St. 2d 87, 434 N.E.2d 1362 (1982), syllabus.  For

constructive possession to exist, "[i]t must also be shown that the person was conscious of the presence of the object." *Williams, supra,* quoting *Hankerson,* 70 Ohio St. 2d at 91, 434 N.E. 2d 1362. The state may prove the existence of the various components of constructive possession of contraband by circumstantial evidence. *Williams, supra,* citing *State v. Jenks,* 61 Ohio St. 3d 259, 272-273, 582 N.E.2d 552 (1991). Moreover, two or more persons may have joint constructive possession of a particular item. *Williams, supra,* citing *State v. Mann*, 93 Ohio App.3d 301, 308, 638 N.E.2d 585 (8th Dist.1993).

{¶21} A defendant's mere presence in an area where drugs are located does not conclusively establish constructive possession. *Williams, supra,* at ¶ 25; *State v. Cola,* 77 Ohio App. 3d 448, 450, 602 N.E.2d 730 (11th Dist.1991); *Cincinnati v. McCartney,* 30 Ohio App. 2d 45, 48, 281 N.E. 2d 855 (1st Dist.1971). However, a defendant's proximity to drugs may constitute some evidence of constructive possession. *Williams, supra,* at 25. Mere presence in the vicinity of drugs, coupled with another factor probative of dominion or control over the contraband, may establish constructive possession. *Fugate,* at *8. Under this framework, Appellant argues he was simply present when the officers arrived for the probation check but no other evidence implicates him.

{¶22} Appellee directs our attention to *State v. Hayslip,* 4th Dist. Adams No. 05CA812, 2006-Ohio-3120. Hayslip was indicted and convicted of the illegal manufacture of drugs, in violation of R.C. 2925.04. On appeal, Hayslip argued his trial counsel provided him ineffective assistance and also argued his conviction was against the manifest weight of the evidence. At Hayslip's trial, the jury heard testimony about the types of materials found in Hayslip's presence at the crime scene, and that these materials were commonly used for the manufacture of methamphetamine. The jury also heard testimony from Hayslip's co-defendant, Carter, that placed Hayslip at the scene of the crime on the day in question, that Hayslip was familiar with the scene of the crime (a shed) and had access to it, and further, that Hayslip was regularly present in the shed with another co-defendant when the shed was used to manufacture methamphetamine.

{¶23} Another co-defendant, Blythe, also testified Hayslip and he had manufactured methamphetamine in the shed before and on the day in question. The jury also heard testimony from a forensic scientist from BCI about the manufacturing process and the ingredients and materials used. The scientist testified that several exhibits contained methamphetamine residue and that pills found in the shed contained pseudoephedrine. Upon review, we concluded that each element of R.C. 2925.04 was proven beyond

a reasonable doubt and that the jury did not lose its way. We overruled

Hayslip's assignment of error and affirmed the trial court's judgment.

{¶24} As in *Hayslip,* we have applied the foregoing principles and

find substantial and credible evidence on all elements of the counts charged

from which a reasonable jury could conclude that Appellant participated in

assembling or possessing the chemicals utilized in the manufacture of drugs.

Although Appellant argues because the testimony references "they" he is not

implicated, the complete testimony, set forth above, makes it clear that

Appellant was being referenced in the mutual activities which occurred at

Gasmire's apartment and on the trip to Walmart on November 9, 2012.

Appellant was present at the Watt Street apartment with the co-defendants at

the time the officers arrived and found the ingredients used to manufacture

methamphetamine. However, other factors coupled with Appellant's

presence lead us to our conclusion.

{¶25} Officer Williams testified when he entered the apartment, he

encountered 4 persons, Gasmire, Paskins, Appellant, and Tyler. Gasmire

testified that his apartment had been used to make crystal methamphetamine,

earlier in the day, and he specified that the 4 persons, which included

himself, had been present at that time. Although Officer Anderson testified

that Appellant was not in the kitchen where the pliers were found, Officer

Williams noted in his testimony that Appellant was sitting just a few feet away from some of the lithium batteries and other items discovered and used in making methamphetamine.

{¶26} The evidence at trial also demonstrated Appellant drove with co-defendant Paskins and others to Walmart to purchase the pseudoephedrine. Although Appellant did not ultimately go into Walmart and make the purchase, Paskins' testimony demonstrated that all persons in the truck knew what their purpose was for going to Walmart. Paskins further testified at length, as set forth above, about Appellant's involvement in crushing the pills at the kitchen table, just before the officers arrived. All the evidence presented led the jury to infer that Appellant participated in the assembly or possession of chemicals associated with the manufacture of drugs.

{¶27} We also note in resolving conflicts of the evidence, the jury was in the best position to observe the witnesses, weigh their demeanor, and any gestures or voice inflections, and determine their credibility. And, instructed as to the legal definitions of direct evidence, circumstantial evidence, and credibility. The jury was instructed that as to the weight of the evidence, they were free to believe all, part or none of any witness's

testimony.  Importantly, the jury was also instructed about the testimony of

accomplices as follows:

> "It is for you, as jurors, in light of all the facts presented to you and
> from the witness stand, to evaluate such testimony and to determine
> its quality and worth or its lack of quality and worth.
>
> An accomplice may have special motives in testifying, and you should
> carefully examine an accomplice's testimony and use it with great
> caution and view it with grave suspicion."

{¶28}  As such, the jurors were in the best position to observe Gasmire and

Paskins and evaluate their credibility in giving testimony against Appellant.

Having done so, we cannot say the jury clearly lost its way and created a manifest

miscarriage of justice.  We therefore overrule this assignment of error and affirm

the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, P.J. & Hoover, J.: Concur in Judgment and Opinion.

For the Court,


BY: _____
Matthew W. McFarland, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**